Theodore BROGDON, Plaintiff,

v.

CITY OF NEW ROCHELLE, Police Officer Daniel Benge and Anthony Chiera and Unidentified New Rochelle Police Officers, Defendants.

No. 00 CIV 5899(CM).

United States District Court,
S.D. New York.

May 15, 2002.

Kathleen A. Daly, Serchuk & Selemyer, LLP.

Amy Marion.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY · JUDGMENT

McMAHON, District Judge.

**Introduction**

Plaintiff Theodore Brogdon ("Brogdon") asserts claims pursuant to 42 U.S.C. § 1983 against the City of New Rochelle (the "City"), Police Officer Daniel Benge ("Benge"), and Police Officer Anthony Chiera ("Chiera") arising from Brogdon's arrest on August 8, 1997. (Complaint). In his complaint, Brogdon alleges that the defendants violated his rights under the Fourth Amendment by falsely arresting him, falsely imprisoning him and compelling him to make "forced court appearances" until all charges were dismissed following a non-jury trial. *Id.* ¶¶ 15–20. He also alleges that the "defendants" failed to affirmatively intervene while other members of the police department were allegedly violating his rights. *Id.* ¶¶ 23–24. These persons who allegedly failed to affirmatively intervene are not named and remain unidentified. In addition, he asserts a *Monell* claim against the City, alleging that its policies and customs led to his claimed injuries. *Id.* ¶¶ 27–34. He has alleged similar claims against the defendant-officers' supervisors, who also were not named specifically and remain unidentified. *Id.* ¶¶ 37–38.

Plaintiff's claims for false arrest, false imprisonment, malicious prosecution and failure to intervene must be dismissed because there was probable cause to arrest and charge Brogdon. Furthermore, both Benge and Chiera are entitled to qualified immunity. In addition, there is no basis for a *Monell* claim against the City, because plaintiff adduces no evidence that the alleged violations of Brogdon's right resulted from any City policy or custom. Finally, Brogdon's claim against the unnamed supervisors also fails, as there is no showing that these unnamed persons created any policy or custom which allowed the commission of any constitutional torts.

**STATEMENT OF FACTS**

**The 911 Call**

At 4:56 a.m. on August 8, 1997, a 911 telephone call was received by the New Rochelle Police Department. The caller reported that someone was "trying to break into the store on the corner of Horton." The caller specified that it was a grocery store, described the person breaking into the grocery store as a male black wearing white pants and a black top, and stated that the perpetrator was using "a stool or something to break the window." Exh. C (Transcript of 911 call) pp. 2–3. The 911 caller also reported that there was someone else on the corner "on the lookout" and described the "lookout" as a black male wearing a "striped shirt" with a "white back." *Id.* p. 4

**Officer Benge's Observations**

On August 8, 1997 Officer Benge was on patrol. At approximately 5:00 a.m., while in his police car, he was notified by the police dispatcher of the burglary in progress at the grocery store on the corner of Horton Avenue and Brook Street, which is located near the precinct. Benge Aff't ¶ 2, Exh. P; Exhs. F (p. 6), H (p. 11), K (pp. 13–14), O (pp. 4–5). The dispatcher described two individuals, both male black, and said that one of the individuals was standing on the corner dressed in a striped shirt acting as a lookout. Benge Aff't ¶ 3, Exhs. P; H (pp. 11–12), K (p. 32).

At the point that he received this transmission, Benge was on North Avenue near Coligni Avenue which connects to Brook Street. Benge Aff't ¶ 2; Exhs. H (p. 12), K (p. 14). He proceeded towards Brook Street with his red overhead lights activated but with his siren off. As he turned southbound onto Brook Street and proceeded towards the intersection of Horton Avenue and Brook Street, he turned off all lights on his vehicle so as to not alert the perpetrators. Benge Aff't ¶ 4; Exhs. H (p. 13), K (pp. 15, 35). As he approached the store, which is located at 49 Horton Avenue, he observed a male black (Brogdon) dressed in a striped shirt standing across the street from the Solutions Grocery Store. Benge did not have any difficulty seeing Brogdon since the area was well-lit. Benge Aff't ¶ 5, Exh P; Exhs. F (p. 7), H (p. 15), O (p. 11). When he first spotted Brogdon, Benge had several moments to observe plaintiff. Benge Aff't ¶ 5. Exhs F(p 7), H (p. 16). Benge specifically noticed that Brogdon was looking around in all directions, up and down the streets and that Brogdon did this several times. Benge Aff't ¶ 5, Exhs. P, Q (p. 17); Exhs. F (p. 7), H (p. 16), K (pp. 19–20).

When Brogdon spotted Benge, he immediately cupped his hands in the form of a megaphone and shouted something in the direction of the grocery store. Benge Aff't ¶ 6, Exhs. P, Q (pp. 18–19); Exhs. H (pp. 16–17), K (p. 21), O (p. 15). Brogdon then turned and fled eastbound on Horton Avenue in the direction of North Avenue, just as Officer Benge approached the grocery store. Benge saw Brogdon break into a run the moment Brogdon left the corner of Brook and Horton. Benge Aff't ¶ 6, Exhs.

P, Q (p. 19); Exhs. F (p 8, 13), H (p. 18), K (p. 21), O (p. 17).

Benge immediately radioed police headquarters to advise them that he had spotted the individual fitting the description provided by the 911 caller (male black in a striped shirt acting as a lookout) and that he was running eastbound on Horton Avenue in the direction of North Avenue. Officer Benge observed other police units arrive and stop in the area where he saw plaintiff running. Benge Aff't ¶¶ 7–8, Exhs. P, Q (p. 19); Exhs. H (pp. 18–19, 25–26), O (pp. 17, 26–27).

When Benge was directly in front of the store, he saw one of the perpetrators trying to go through a broken window. He exited his vehicle and attempted to grab the individual but was unable to do so. Benge secured the location until other police units arrived. Benge Aff't ¶ 9, Exhs. P, Q (pp. 19–20); Exhs. H (p. 23), K (pp. 21–22), O (pp. 18, 22). At this point, Benge received another radio transmission indicating that Brogdon had been apprehended by Officer Chiera on Horton Avenue. Benge Aff't ¶ 10, Exhs. P, Q (pp. 22–23); Exh. H (pp. 27–28).

**The Apprehension of Plaintiff**

Officer Chiera received a radio call of a burglary in progress at the Solutions grocery store on the corner of Horton and Brook. The dispatcher described the perpetrators as two male blacks, one breaking into the store and the other one standing on the corner, acting as a lookout. The lookout was described as wearing a striped shirt. Chiera Aff't ¶¶ 2–3; Exh. J (pp. 20–21), O (pp. 39–40). As he was proceeding to the intersection of Horton and Brook, Chiera received another radio transmission, this one from Benge, advising that the person described as the "lookout" was running eastbound on Horton Avenue and that he was dressed in a striped shirt and dark pants. Exh. J (p.

24); Chiera Aff't ¶ 4, Exhs. R, S (pp. 30–31).

When he got to the intersection of Brook and Horton, Chiera spotted Brogdon, who was wearing a striped shirt with a light-colored solid back, running eastbound on Horton. Chiera Aff't ¶ 5, Exhs. R, S (p. 31); Exhs. J (p. 22), O (p. 41). After radioing Brogdon's location to police headquarters, Chiera then chased after Brogdon. Chiera stopped Brogdon approximately half a block away from the grocery store. Chiera Aff't ¶ 5; Exhs. J (p. 22), O (p. 45). Although Chiera identified himself as a police officer, Brogdon ignored Chiera's commands to "stop". Brogdon turned around and started to proceed westbound on Horton. Chiera repeated his commands until Brogdon complied and sat on the ground. Within a short period of time, other back-up units arrived to assist. Chiera Aff't ¶ 6, Exh. R; Exhs. J (pp. 28–29), O (p. 45). When Chiera first tried to stop Brogdon, plaintiff volunteered that he had "no knowledge of what [was] happening at the corner of Horton and Brook." Chiera Aff't ¶ 7, Exh. R.

**Identification and Arrest of Plaintiff**

Benge received a radio transmission indicating that the plaintiff had been apprehended by Officer Chiera on Horton Avenue. Benge Aff't ¶ 10, Exh. P; Exh. H (p. 27). After the grocery store had been secured, Benge walked to where Officer Chiera had stopped plaintiff and positively identified Brogdon as the individual whom he had seen standing on the corner of Brook and Horton, directly opposite the grocery store, looking in all directions. Benge Aff't ¶ 10, Exhs. P, Q (pp. 22–23); Exh. H (pp. 27–28).

Officer Benge then placed Brogdon under arrest. Benge Aff't ¶ 11. D.

## Prior Pertinent Proceedings

Officer Benge signed a felony complaint prepared by the Office of the District Attorney of Westchester County charging both plaintiff and a co-defendant, Kelvin Wilson, with burglary in the third degree (N.Y. Penal Law § 140.20).[1] Benge Aff't ¶ 12; E. Thereafter, he testified at a felony hearing in August 1997. Benge Aff't ¶ 13. While co-defendant Kelvin Wilson remained in custody, the charges against plaintiff were dismissed for insufficient evidence pending presentation to a grand jury. Marion Decl. Exh. E (pp. 37–38).

Both Benge and Chiera testified before the grand jury. Benge. Aff't ¶ 14. Chiera Aff't ¶ 11. The grand jury voted to indict Brogdon and his co-defendant on charges of burglary in the third degree and criminal mischief in the third degree,[2] finding probable cause to believe that each defendant had aided and abetted and acted in concert with the other in the burglary of the Solutions grocery store. *People v. Wilson and Brogdon,* Indictment Nos. 97–1236–01, 02. Brogdon moved in Westchester County Court for an inspection of the grand jury minutes and for dismissal of the indictment. In a decision dated December 1, 1997, the court (LaCava, J) found that

> the evidence before the Grand Jury satisfied the requirements of CPL Sec. 190.65, in that it is legally sufficient to establish a prima facie case against the defendant on the charges contained in the indictment and that such evidence was competent and admissible such that, if unexplained and uncontradicted, a conviction after trial would be warranted. The Court further finds that the instructions given to the Grand Jury with respect to the applicable law in this case was proper and legally sufficient. The defendant's motion to dismiss the indictment, therefore, is denied.

Exh. M (p. 4).

At a hearing conducted in reference to Brogdon's motion to suppress identification testimony, he raised the issue of lack of probable cause for his arrest. In a decision dated, May 18, 1998, the court, (Zambelli, J.), found that there was probable cause to arrest plaintiff and that there was nothing improper about the identification procedure employed. Specifically, the court stated:

> The Court credits the testimony of the People's witness. In the court's opinion, Brogdon's actions in looking all around shouting something in the direction of Wilson upon the witness' approach, his flight after the Police Officer got closer, the contents of the 911 call, the fact that he matched the description reported, and the witness' observation that the back-up unit apprehended the same individual he saw on the corner, cumulatively provided probable cause for de-

---

1. N.Y. Penal Law § 140.20. Burglary in the third degree

 A person is guilty of burglary in the third degree when he knowingly enters or remains unlawfully in a building with intent to commit a crime therein.

 N.Y. Penal Law § 20.00. Criminal liability for conduct of another

 When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.

2. N.Y. Penal Law § 145.05. Criminal mischief in the third degree

 A person is guilty of criminal mischief in the third degree when, with intent to damage property of another person, and having no right to do so nor any reasonable ground to believe that he has such right, he damages property of another person in an amount exceeding two hundred fifty dollars.

fendant's arrest as an accomplice to Wilson's burglary of the premises (*see, People v. Basch* 36 N.Y.2d 154, 365 N.Y.S.2d 836, 325 N.E.2d 156). The Officer's ensuing positive identification of Brogdon at the point of apprehension was sufficiently connected and contemporaneous to the arrest itself as to constitute the ordinary and proper completion of an integral police procedure (*see, People v. Wharton,* 74 N.Y.2d 921, 923, 550 N.Y.S.2d 260, 549 N.E.2d 462). Exh. N.

Brogdon proceeded to a non-jury trial on the charges of burglary in the third degree and criminal mischief in the third degree. While "mindful of the circumstantial evidence which appears to link the defendant" to the charges, the court (La-Cava, J.) found that "unfortunately" the People had not proved its case beyond a reasonable doubt. Exh. T. All charges against Brogdon were dismissed. *Id.*

**Commencement of this Action**

On August 8, 2000, Brogdon commenced this action naming the City and Officers Benge and Chiera as defendants. Exh. A.

The City and the defendant police officers answered the complaint and denied the material allegations therein. Exh. B. Additionally, a number of affirmative defenses were asserted on behalf of all or some of the defendants. Included among these defenses was that there was probable cause "seize, arrest and prosecute" Brogdon. *Id.* ¶ 13. In addition, both Benge and Chiera asserted that they were entitled to qualified immunity. *Id.* ¶¶ 15–22.

## DISCUSSION

### Point I

### THERE WAS PROBABLE CAUSE TO ARREST BROGDON AND TO CHARGE HIM WITH BURGLARY

To the extent that Brogdon is asserting claims against Benge and Chiera individually, those claims must be dismissed, as there was probable cause to arrest Brogdon and to prosecute him on the charges of burglary and criminal mischief.[3]

It is well-settled that "[t]here can be no federal civil rights claim for false arrest

---

**3.** There is nothing in plaintiff's complaint to indicate that Brogdon is suing Benge and Chiera in any capacity other than an official one. While the caption simply refers to them as "police officers," the *complaint* alleges specifically that Benge and Chiera were employed by the City and that "[a]ll of the acts of the defendants alleged herein were done by the defendants, their agents, servants and employees, *not as individuals,* but under the color and pretense of the statutes, ordinances, policies, regulations, customs and usages of the State of New York, the City of New Rochelle, *and under the authority of their office as police officers* of said State and City." Exh. A, ¶¶ 10, 12 (emphasis added). As the Supreme Court held in *Brandon v. Holt,* 469 U.S. 464, 472, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985), " 'official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent' " (*quoting Monell v. Department of Social Services,* 436 U.S. 658, 690 n. 55, 98

S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)). In other words, "[i]t is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)(emphasis in original). The distinction is important for purposes of establishing liability under section 1983. As the Court explained in *Kentucky:*

> to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. See, *e.g., Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a " 'moving force' " behind the deprivation, *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (quoting *Monell, supra,* at 694, 98 S.Ct. 2018); thus, in an official-capacity suit the entity's "policy or

where the arresting officer had probable cause." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995). Moreover, where probable cause exists to prosecute an individual, a claim that he was subjected to "forced court appearances" or was maliciously prosecuted also fails—even if he was ultimately acquitted. *See Bernard v. United States,* 25 F.3d 98, 104 (2d Cir. 1994).

## A. There was Probable Cause to Arrest Brogdon

To establish a claim for false arrest and/or false imprisonment a plaintiff must prove, inter alia, that his confinement was not otherwise privileged. *Singer,* 63 F.3d at 118; *Bernard,* 25 F.3d at 102; *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310 (1975). If the arresting officer has probable cause, the confinement is otherwise privileged. *Decker v. Campus,* 981 F.Supp. 851, 856 (S.D.N.Y.1997)("[i]f there existed probable cause at the time of the arrest, the arrest is 'privileged,' and the individual has no constitutional or statutory claim against the officer who made the arrest.")

Probable cause or reasonable cause exists where facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been committed by the person under inquiry. *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949); *Curley v. Village of Suffern,* 268 F.3d 65 (2d Cir.2001); *Singer,* 63 F.3d at 118; *Golino v. New Haven,* 950 F.2d 864, 870, (2d Cir.1991),

*cert. denied,* 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992). Whether the probable cause standard has been met in a particular case is determined by reference to the "totality of the circumstances." *Bernard,* 25 F.3d at 102 (*quoting Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983)).

The validity of an arrest does not depend upon an ultimate finding of guilt. *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967); *Fernandez v. DeLeno,* 71 F.Supp.2d 224, 229 (S.D.N.Y.1999). The soundness of an arrest hinges on the existence of probable cause at the time of the arrest and immediately before it. *Lowth v. Town of Cheektowaga,* 82 F.3d 563 (2d Cir.1996); *Zanghi v. Old Brookville,* 752 F.2d 42, 45 (2d Cir.1985). Probable or reasonable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information. *Bernard,* 25 F.3d at 102 (citing *Colon v. City of New York,* 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983)). Even if the basis for the arrest dissipated subsequent to the arrest, it does not eliminate the probable cause that existed at the time of the arrest. *Dukes v. City of New York,* 879 F.Supp. 335, 341 (S.D.N.Y.1995).

■ Clearly, Officer Benge had probable cause to believe that Brogdon, along with his co-perpetrator, Kelvin Wilson, had committed the crime of burglary in the third degree. In this instance, there was a 911 call from a witness who described two black males, one breaking into the grocery store and the other standing on the corner

---

custom" must have played a part in the violation of federal law. *Monell, supra; Oklahoma City v. Tuttle,* 471 U.S. 808, 817–818, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *id.,* at 827–828, 105 S.Ct. 2427 (BRENNAN, J., concurring in judgment).

*Id.* at 159, 105 S.Ct. at 3105. I conclude, reading the complaint most favorably to plaintiff, that he seeks to hold the officers personally liable, and therefore really sues them individually for violating his civil rights under color of state law.

dressed in a "striped shirt" with a "white back" acting as a "lookout." Exh. C. Officer Benge, who learned of the call from a 911 dispatcher, proceeded toward the corner described, where he saw exactly what the caller to 911 had described—a male black dressed in a striped shirt standing on the corner across the street from the grocery store "looking in all directions." *See* Benge Aff't ¶ 5, Exhs. P, Q (p. 17). Exhs. F (p. 7), H (p. 15–16), K (pp. 19–20), O (p. 11). Officer Benge noticed that the suspect did this several times. *Id.* When the suspect spotted Benge, he immediately cupped his hands in the form of a megaphone and shouted something in the direction of the grocery store. *See* Benge Aff't ¶ 6, Exhs. P, Q (pp. 18–19); Exhs. H (pp. 16–17), K (p. 21), O (p. 15). The suspect then fled eastbound on Horton Avenue.

Benge notified police headquarters of his observations. He stated that the person fitting the description provided by the 911 caller (*i.e.* male black in a striped shirt) had fled and was headed eastbound on Horton Avenue.

Officer Chiera had also gone toward to 49 Horton Avenue when he heard the initial radio dispatch. *See* Chiera Aff't ¶¶ 2–3; Exh. O, (pp. 39–40). As Chiera was approaching the grocery store, he received radio call from Officer Benge indicating that the person standing on the corner acting as the lookout was running eastbound on Horton Avenue. Officer Chiera heard Officer Benge describe this individual as a black male in a striped shirt. *See* Chiera Aff't ¶ 4, Exhs. R, S (pp. 30–31). When Officer Chiera got to the intersection of Brook Street and Horton Avenue, he saw the suspect wearing a striped shirt running eastbound on Horton Avenue. After notifying police headquarters of Brogdon's location, Officer Chiera chased the plaintiff. Chiera stopped Brogdon ap-

proximately half a block away from the grocery store. *See* Chiera Aff't ¶ 5, Exh. S (p. 31); Exh. O (pp. 41, 45). Brogdon was wearing a shirt that had a striped front and a light colored solid back. *Compare* Exh. C (p. 4) *with* Exh. O (p. 41).

Benge received a radio transmission that plaintiff had been apprehended by Officer Chiera. Shortly after Brogdon was stopped and after the grocery store had been secured, Officer Benge walked from the grocery store to where Brogdon was being held. *See* Benge Aff't ¶ 10, Exh. P; Exh. H (p. 27). Benge positively identified Brogdon as the individual he observed standing on the corner acting as a lookout. *See* Benge Aff't ¶ 10, Exh. P; Exh. H (pp. 27–28).

No reasonable trier of fact could possibly conclude that the defendant officers lacked probable cause to arrest plaintiff. Observations of the sort made personally by Officer Benge have been held in prior cases to establish probable cause to make an arrest. *See, e.g., United States v. Tussa*, 816 F.2d 58 (2d Cir.1987)(suspects activity in frequently looking around to see if they were being watched culminating in the delivery of a package to a car in which the suspects waited could serve as the basis for trained law enforcement officers to believe that a crime had been committed); *see also People v. Romano*, 256 A.D.2d 118, 682 N.Y.S.2d 157 (1st Dep't 1998)(the totality of the observations of the officer that defendant was engaging in " 'casing' type behavior (involving crossing back and forth across the street for that purpose)" satisfied the probable cause standard); *People v. Burnside*, 254 A.D.2d 98, 679 N.Y.S.2d 110 (1st Dep't 1998)(because defendant's behavior was consistent with that of a lookout, there was probable cause to arrest); *People v. Arriaga*, 204 A.D.2d 96, 97, 611 N.Y.S.2d 183, 184 (1st Dep't 1994) (defendant's conduct in acting

as a lookout and attempting to distract officer's attention was "sufficient to give rise to probable cause"); *People v. Cicciaro*, 133 A.D.2d 645, 519 N.Y.S.2d 754 (2d Dep't 1987)(officer's observations of defendant sitting in a parked car with a walkie-talkie and scanner in the vicinity of incident location early on a Sunday morning, corroborated by an informant's statement, was sufficient to find probable cause for defendant's arrest as a "lookout" in a burglary).

The fact that plaintiff was ultimately acquitted does not mean that the officers did not have probable cause to arrest him. A law enforcement official "has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." *Miloslavsky v. AES Engineering Soc., Inc.*, 808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd*, 993 F.2d 1534 (2d Cir.1993), *cert. denied*, 510 U.S. 817, 114 S.Ct. 68, 126 L.Ed.2d 37 (1993). Here, Benge's personal observations corroborated the information that the 911 dispatcher received from the civilian complainant. This more than overcomes any suggestion that it would have been unreasonable for Benge to rely on the original eyewitness report to 911 in order to make a probable cause determination in this case.

Before stopping Brogdon, Officer Chiera had not only the 911 dispatcher's report but also the information he received from Benge, who confirmed key elements of the 911 call and indicated that he had seen plaintiff engage in suspicious behavior—i.e., yelling, fleeing the scene. Chiera was entitled to rely on the report of his fellow officer in deciding whether there was reasonable suspicion to stop Brogdon. *See Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir.2000) ("police officers, when making a probable cause determina-

tion.... *are also entitled to rely on the allegation of fellow police officers*") (citations omitted)(emphasis in original); *People v. Edwards*, 95 N.Y.2d 486, 491, 719 N.Y.S.2d 202, 204, 741 N.E.2d 876 ("[a] police witness ... may establish probable cause by personal knowledge, as well as by information supplied by fellow officers") (citations omitted). *See also People v. DeBour*, 40 N.Y.2d 210, 224, 386 N.Y.S.2d 375, 385–86, 352 N.E.2d 562 ("the crucial question is what degree of belief was reasonably generated by the information transmitted over the radio [from one officer to another]").

### The Grand Jury Indictment Creates the Presumption of Probable Cause

An indictment by a grand jury creates a presumption of probable cause that can only be overcome by establishing that the indictment itself was procured by "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Bernard*, 25 F.3d at 104 (*citing Colon*, 60 N.Y.2d at 82, 468 N.Y.S.2d at 455–56, 455 N.E.2d 1248). In New York, a grand jury is authorized to vote to indict when it finds that "the evidence before it is legally sufficient to establish that the defendant committed such offense ... [a]nd competent and admissible evidence before it provides reasonable cause to believe that such person committed such offense." N.Y.Crim. Proc. Law § 190.65 (McKinney 1993). *Scheiner v. Wallace*, No. 93 Civ. 0062, 1996 U.S. Dist. Lexis 16315 at *21 (S.D.N.Y.1996). The presumption of probable cause based upon a grand jury indictment is "so strong that it may only be overcome by evidence demonstrating that the Defendants engaged in fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Dukes v. City of New York*, 879

F.Supp. 335, 341–42 (S.D.N.Y.1995)(quoting *Bernard,* 25 F.3d at 104).

■ The record is barren of evidence (as opposed to conclusory allegations) to overcome the presumption created by the indictment. Brogdon asserts that Benge perjured himself, but that conclusory allegation is insufficient to overcome this strong presumption. To establish that Officer Benge committed perjury before the grand jury sufficient to overcome the presumption of the existence of probable cause, Brogdon "would have to submit evidence in admissible form which establishes that those witnesses willfully and corruptly gave false testimony under oath as to a matter material to the issue or point in question." *Scheiner,* 1996 U.S. Dist. Lexis 16315 at *22 (*citing* N.Y. Penal Law §§ 210.50, 210.15 and *People v. Davis,* 53 N.Y.2d 164, 440 N.Y.S.2d 864, 423 N.E.2d 341 (1981)); *see also Boomer v. Bruno,* 134 F.Supp.2d 262, 268 (N.D.N.Y.2001)("plaintiff must prove that the police conduct 'deviated egregiously from statutory requirements or accepted practices applicable in criminal cases' "). He has not done so.

Brogdon contends that Officer Benge's alleged perjury centered on Benge's testimony that Brodgon was acting as a lookout. Exh. I (pp. 35–36, 48). But he offers no evidence that Benge did not observe such behavior. Officer Benge's observation that Brogdon looked in several directions before Brogdon spotted him, and his cupping his hand and yelling something in the direction of the store once he spotted Benge, are consistent with his acting as a lookout, and are corroborated by the 911 caller, who stated that someone on the corner was "on the lookout." *Compare* Exh. C (p. 4) *with* Exhs. P, Q (p. 17) *and* Exhs. F (p. 7), H (p. 16), and O (p. 11). County Court Judge Zambelli found Officer Benge's testimony concerning his ob-

servations to be credible. Exh. N. There is simply no evidence pointing to the commitment of perjury by Officer Benge.

Brogdon attempts to establish Benge's perjury by asserting that he was not in fact acting as the "lookout" for any robbery, but just happened to be walking home from a friend's house when the store was being burgled. That, of course, is not evidence of knowing falsehood by Benge, who testified about what he saw and drew the conclusion that plaintiff was the lookout based on objective facts—his position, his vigilance, his calling out, and his flight—that are adequate to support such a conclusion. In any event, "The existence of a 'swearing contest' between plaintiff as to his innocence and an eye-witness as to the events 'cannot of itself render the issue of probable cause a jury question.' " *Dukes v. City of New York,* 879 F.Supp. 335, 342 (S.D.N.Y.1995).

Hence, Brogdon's claims of false arrest and false imprisonment must be dismissed.

## B. Brogdon Cannot Support His Claim for Malicious Prosecution

■ Brogdon also claims that Chiera and Benge violated his constitutional rights by subjecting him to "unlawful forced court appearances." Exh. A ¶ 20. In order for Brogdon to prevail on his claim of malicious prosecution or "unlawful forced court appearances," he must establish that (1) defendants commenced or continued a criminal proceeding against him, (2) the criminal proceeding was terminated in his favor, (3) there was a lack of probable cause for the proceeding, and (4) defendants initiated the criminal proceeding out of actual malice. *Bernard,* 25 F.3d at 104; *Colon,* 60 N.Y.2d at 82, 468 N.Y.S.2d at 455, 455 N.E.2d 1248. Brogdon's failure to establish each one of these elements dooms his claim. *Scheiner,* 1996 U.S. Dist. Lexis 16315 at *17.

■ As discussed above, probable cause existed to arrest Brogdon, and in any event the grand jury's indictment creates a presumption of probable cause. *See Bernard,* 25 F.3d at 104 ("the fact that the Grand Jury returned an indictment against Bernard creates a presumption that his arrest and indictment were procured with probable cause."). Further, in order to prevail on a claim of malicious prosecution, a plaintiff must prove that the prosecution was motivated by "malice." Malice means "that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Nardelli v. Stamberg,* 44 N.Y.2d 500, 502–03, 406 N.Y.S.2d 443, 445, 377 N.E.2d 975 (1978); *Rounseville v. Zahl,* 13 F.3d 625, 630 (2d Cir.1994). As this Court has stated, "there must be 'a showing of some deliberate act punctuated with awareness of 'conscious falsity' to establish malice.'" *Caldarola v. DeCiuceis,* 142 F.Supp.2d 444, 452 (S.D.N.Y.2001). There is nothing in this record evincing even an inference of a motivation on the part of defendants to pursue Brogdon for any purpose other than to "see the ends of justice served." *Id. (quoting Nardelli,* 44 N.Y.2d at 503, 406 N.Y.S.2d at 445, 377 N.E.2d 975).

Accordingly, Brogdon's claim of malicious prosecution also fails.

### Point II

### THERE WAS NO FAILURE TO PROTECT BROGDON'S CONSTITUTIONAL RIGHTS

■ In conclusory fashion, Brogdon asserts in his second cause of action that his constitutional rights were violated by the failure of the police officer defendants to intervene and protect him from the alleged infringement of his rights by the other law enforcement defendants during the course of his arrest. Exh. A ¶¶ 23–24.

Brogdon fails to identify which police officer "failed to intercede to prevent preventable harms caused by the other officers' actions," *Id.* ¶ 23, so his second cause of action must be dismissed simply because he does assert it against any served defendant. Moreover, as there is neither any claim or any evidence of excessive force, or of any other constitutional violation, his cause of action can only be grounded in the allegations of false arrest and malicious prosecution—which are themselves groundless because there was probable cause to arrest Brogdon.

■ Where the arresting officer has not infringed plaintiff's constitutional rights, liability against any other law enforcement defendants who may have witnessed plaintiff's arrest is precluded as a matter of law. *Curley v. Village of Suffern,* 268 F.3d 65, 71–72 (2d Cir.2001) As set forth above, the existence of probable cause justifies an arrest and as a consequence "is a complete defense to an action for false arrest" under section 1983. *Bernard,* 25 F.3d at 102. No reasonable trier of fact could conclude that Benge and Chiera lacked probable cause to believe that Brogdon was involved in the commission of the burglary. *See supra* Point I. Therefore, the arrest was "privileged" as a matter of law. Accordingly, there could not have been any constitutional failure to intervene.

### Point III

### BENGE AND CHIERA ARE ENTITLED TO QUALIFIED IMMUNITY

■ Even if there were a disputed issue of fact over the existence of probable cause in this case, the claims against the officer defendants would have to be dismissed because the are entitled to qualified immunity as a matter of law.

The doctrine of qualified immunity shields a government employee acting in his/her official capacity from suits for damages under 42 U.S.C. § 1983, insofar as his/her conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Martinez v. Simonetti,* 202 F.3d 625, 633–34 (2d Cir.2000); *Posr v. Doherty,* 944 F.2d 91, 95 (2d Cir.1991). Furthermore, a police officer is entitled to qualified immunity if it was "objectively reasonable" for the officer to believe that no rights were being violated by his conduct. *Provost v. The City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001). The Supreme Court has recently defined what it means for a law to be "clearly established" in the context of a qualified immunity defense:

> 'Clearly established' for purposes of qualified immunity means that 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.'

*Wilson v. Layne,* 526 U.S. 603, 614–15, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)(*citing Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). As the *Wilson* Court explained:

> It could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of police.... However, as we explained in *Anderson,* the right allegedly violated

must be defined at the appropriate level of specificity before a court can determine if it was clearly established.

*Id.* at 615, 119 S.Ct. at 1699–1700 (citations omitted).

A right is "clearly established" if the contours of the right are sufficiently clear in the context of the alleged violation. *Johnson v. Newburgh Enlarged School District,* 239 F.3d 246, 250 (2d Cir.2001). The asserted right which was allegedly violated must be articulated in relation to the factual situation at hand. In ascertaining whether the right was "clearly established" with respect to a given situation, a court must consider "not what a lawyer would learn or intuit from researching case law, but what a reasonable person in [the government actor's] position should know" about the appropriateness of his conduct under federal law. *Id., citing Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998).

As to the first prong of this immunity analysis, the violation of clearly established law "must be apparent," that is, that reasonable police officers in defendant's position would have known that the conduct was unlawful based upon existing law. *Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001)(*quoting Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 (1987)). On a motion for summary judgment, the issue is whether a reasonable police officer would have known that what he was doing was **clearly illegal** based upon the facts before him. *Act/UP!/Portland v. Bagley,* 988 F.2d 868 (9th Cir.1993).

The actions of Benge and Chiera did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Brogdon's conclusory allegations that the officers' conduct violated his Fourth Amendment rights are contradicted by the findings of

Judge Zambelli and the grand jury that there was probable cause to believe Brogdon had committed a crime. *United States v. Tussa*, 816 F.2d 58 (2d Cir.1987); *People v. Romano*, 256 A.D.2d 118, 682 N.Y.S.2d 157 (1st Dep't 1998); *People v. Burnside*, 254 A.D.2d 98, 679 N.Y.S.2d 110 (1st Dep't 1998); *People v. Arriaga*, 204 A.D.2d 96, 611 N.Y.S.2d 183 (1st Dep't 1994); *People v. Cicciaro*, 133 A.D.2d 645, 519 N.Y.S.2d 754 (2d Dep't 1987).

Brogdon points to no rules, regulations or case law that would suggest that Benge or Chiera should have known that they were violating clearly established law when Brogdon was arrested. Even if the arrest were unlawful, the police officer defendant would still entitled to qualified immunity if there was " 'arguable probable cause.' " *Provost*, 262 F.3d at 160 (*quoting Lee v. Sandberg*, 136 F.3d 94 (2d Cir.1997)). In *Provost*, the Second Circuit articulated the reasoning underlying this immunity defense:

> Qualified immunity "serves important interests in our political system," *Sound Aircraft Servs., Inc. v. Town of East Hampton*, 192 F.3d 329, 334 (2d Cir. 1999), chief among them to ensure that damages suits do not "unduly inhibit officials in the discharge of their duties" by saddling individual officers with "personal monetary liability and harassing litigation." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Cf. *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 456 F.2d 1339, 1348 (2d Cir. 1972) ("Even learned and experienced jurists have had difficulty in defining the rules that govern a determination of probable cause.... As he tries to find his way in this thicket, the police officer must not be held to act at his peril")

*Id.* at 160.

The second prong of the qualified immunity analysis requires a finding that the officers' conduct was "objectively reasonable" under the circumstances. As noted by the Second Circuit, "we are not concerned with the correctness of the defendants' conduct, but rather the 'objective reasonableness of their chosen course of action given the circumstances confronting them at the scene." *Martinez*, 202 F.3d at 634 (*quoting Lennon v. Miller*, 66 F.3d 416, 422 (2d Cir.1995)). *See also Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987)(qualified immunity defense applicable if officers of reasonable competence could disagree on whether the probable cause test was met.) There can be no doubt that it was objectively reasonable for Benge and Chiera to have believed that there was probable cause to arrest and charge Brogdon with burglary. *See supra* Point I (observations of Benge that Brogdon, dressed in a striped shirt and standing across the street from the store, was looking in all directions and acting like a lookout, followed by plaintiff's shouting in the direction of the store and his immediate flight from the scene once he spotted Benge. These facts, in combination with the independent findings of Judge Zambelli and the grand jury, are more than sufficient to support a conclusion that it was objectively reasonable for these officers to conclude probable cause to charge Brogdon with burglary. *See Ferreira v. Westchester County*, 917 F.Supp. 209 (S.D.N.Y. 1996), holding that based upon the uncontradicted findings of the judge at the suppression hearing and the grand jury's indictment, no reasonable trier of fact could conclude that defendant officers' probable cause determination not objectively reasonable.

Hence, assuming that Officers Benge and Chiera are sued in their individual capacities, the claims of false arrest, false imprisonment and malicious prosecution

should be dismissed because the officers are protected by qualified immunity.

## Point IV
### THERE IS NO EVIDENCE OF SUPERVISORY LIABILITY

 In his fourth cause of action, Brogdon alleges that unnamed and unidentified officers "who were supervisors of the defendant officers" are liable for among other things, failing to "train" defendant officers in "appropriate investigative techniques" and "when to arrest," failing to "discipline violent officers" and failing to train defendant officers on their "affirmative duty to intervene." Exh. A ¶¶ 37–38. This claim is not asserted against any identified individual who has been served with process; it must be dismissed for that reason alone. It also fails to state a cause of action.

 Under section 1983 only a defendant who "personally 'subjects, or causes to be subjected' any person to the deprivation of any federal right will be held liable. Accordingly, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Dove v. Fordham University*, 56 F.Supp.2d 330, 336 (S.D.N.Y.1999)(*quoting Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986)). A defendant-supervisor can be personally involved for purposes of section 1983 if the defendant-supervisor (1) was directly involved in the alleged violation, (2) failed to remedy the alleged wrong after being informed of it, (3) created a policy or custom under which the alleged violation occurred, (4) was grossly negligent in his supervision of those subordinates who were responsible for the alleged violation, or (5) was deliberately indifferent to the rights of persons by failing to act on the information that unconstitutional violations were occurring. *Colon v. Coughlin*, 58 F.3d 865, 873

(2d Cir.1995). There is nothing in either the complaint or in any documents testimony demonstrating that any supervisor of Benge and Chiera satisfies any of these criteria.

 Second, there is nothing in this record to indicate that there is a pattern of supervisory acquiescence in the unconstitutional arrests being made by those officers under their supervision. As the Second Circuit held in *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir.1980), "absent more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct, a policy could not ordinarily be inferred from a single incident of illegality such as a first arrest without probable cause or with excessive use of force" (citations omitted). While Brogdon alleges in conclusory fashion that these unidentified supervisors have allowed "violent" police officers to retain their jobs, and have failed to discipline these alleged "violent" officers, it is noteworthy, that Brogdon does not allege that any of the named defendants in this case were violent or used excessive force against him. *See* Exh. A. His claim here is that he was arrested without probable cause. He proffers no evidence of any departmental policy of fostering or condoning arrests without probable cause.

 Finally, because no reasonable trier of fact could conclude that Benge and Chiera violated Brogdon's rights, plaintiff's claim against these unidentified supervisors must fail. *See Mroz v. City of Tonawanda*, 999 F.Supp. 436, 461 (W.D.N.Y. 1998)("a claim of inadequate training and supervision under § 1983 cannot be made out against a supervisory body without a finding of a constitutional violation by the persons supervised")(*quoting Ricciuti v.*

*New York City Transit Authority,* 124 F.3d 123 (2d Cir.1997)).

This cause of action is dismissed.

### Point V

### THE CITY HAS NO LIABILITY

There being no constitutional deprivation here, the City of New Rochelle cannot be held liable and the claim against it must be dismissed as well. Additionally, plaintiff's fifth cause of action is barred under the *Monell* doctrine.

■ Because Benge and Chiera did not violate Brogdon's rights, the issue of the City's liability is moot. "Where the individual agents of the municipality have been found not to have violated the plaintiff's rights, no liability under § 1983 can attach to the municipality based on a claim of failure to train." *Mroz,* 999 F.Supp. at 461 (*citing City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986)).

■ Moreover, the City cannot be held directly liable for the unconstitutional acts of its employees based solely on the employer-employee relationship. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Canton v. Harris,* 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). It is only when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38.

■ The first question to be answered in any case alleging municipal liability is whether there is a direct causal link between some municipal policy or custom, and the alleged constitutional deprivation. *Canton,* 489 U.S. at 385, 109 S.Ct.

at 1203. "[M]unicipal liability under § 1983 attaches where—and only where— a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986); *see also Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation. *Oklahoma,* 471 U.S. at 824, 105 S.Ct. at 2436, ("[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*").

■ Here, apart from the conclusory allegations contained in the complaint that the City, *inter alia,* "failed to adequately discipline," the defendant officers involved in the arrest of plaintiff and "failed to train [these officers] … in the proper criteria to make an arrest … [and] conduct an investigation," Brogdon offers no *evidence* of the existence of any policy or custom, or a determination by a policy-making official that resulted in a violation of his rights. Exh. A ¶¶ 26–34. That requires dismissal of the fifth cause of action. *See Moultry v. City of Poughkeepsie,* 154 F.Supp.2d 809 (S.D.N.Y.2001)(this Court granted summary judgment on the municipal liability claim finding no proof of any departmental policy encouraging the police officers to make arrests in the absence of probable cause); *Perlleshi v. County of Westchester,* 2000 WL 554294, 2000 U.S. Dist. Lexis 6054 (S.D.N.Y.2000)(this Court noted that "[t]he mere assertion … that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference") (citation omitted).

See also Carson v. Lewis, 35 F.Supp.2d 250, 266 (E.D.N.Y.1999) ("conclusory allegations of misconduct are not sufficient evidence of municipal policy or custom"); Covington v. City of New York, 1998 U.S. Dist. Lexis 6283 (S.D.N.Y.1998)(court dismissed claim based on conclusory allegations of municipal liability because there was no factual support for the allegations evident anywhere).

## Point VI

### ANY STATE LAW CLAIMS ARE ALSO DISMISSED

■ Brogdon claims that this action arises in part from "the rights guaranteed by the Constitution and laws of the State of New York." Exh. A ¶ 11. To the extent that he is asserting state law claims for false arrest, false imprisonment and malicious prosecution under New York State law, those claims are barred by his failure to file a notice of claim against any of the defendants.

New York's General Municipal Law provides in pertinent part:

No Action ... shall be prosecuted or maintained against a city ... for personal injury ... alleged to have been sustained by reason of negligence or wrongful act of such city ... or of any officer, agent or employee thereof ... unless ... a notice of claim shall have been made and served upon the city ... in compliance with section fifty-e of [the New York General Municipal Law]

N.Y. GML § 50–i(1).

It further provides:

In any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action ... against a public corporation ...or any officer, appointee or employee thereof, the notice of claim shall be served within ninety days after the claim arises

N.Y. GML § 50–e (1)(a).

A cause of action for false arrest and/or false imprisonment accrues at the time the plaintiff is detained and/or confined. Day v. Morgenthau, 909 F.2d 75 (2d Cir.1990). A cause of action for malicious prosecution accrues when the action is terminated in favor of the plaintiff. Nordco A.S. v. Ledes, 1999 WL 1243883, 1999 U.S. Dist. Lexis 19605 (S.D.N.Y.1999). In any action against a municipal employee, the claimant must serve a notice of claim on the municipal employer if the employee was acting within the scope of his or her employment and is covered by statutory indemnification provisions. Ruiz v. Herrera, 745 F.Supp. 940 (S.D.N.Y.1990).

A plaintiff's state law tort claims in a federal civil rights action against a city and police officers employed by the city should be dismissed when the plaintiff's notice of claim is filed more than 90 days after the claims arose. Steiner v. City of New York, 920 F.Supp. 333, 342 (E.D.N.Y.1996). Given that Brogdon has never filed a notice of claim against these defendants, his pendent state law claims must be dismissed with prejudice. The entire complaint having been dismissed, the Clerk is directed to close the file.