Robert PINTER, Plaintiff,

v.

THE CITY OF NEW YORK, Mayor Michael Bloomberg, Police Commissioner Raymond Kelly, Director of the Office of Special Enforcement Shari C. Hyman, New York City Police Chief Joseph Esposito, Chief Anthony Izzo, Deputy Chief Brian Conroy, Assistant Chief Raymond Diaz or "John Smith", Captain "Joe" Braille, Undercover Police Officer # 31107, Detective Jessica Sterling, Sergeant Michael Madison, Detective Michael Michilena, Detective Sandra Dailey, and Officers "John Does", individually and in their official capacities, Defendants.

No. 09 Civ. 7841 (SAS).

United States District Court, S.D. New York.

Sept. 13, 2010.

James I. Meyerson, New York City, for Plaintiff.

Tonya Jenerette, Senior Counsel, The City of New York Law Department, New York City, for Defendants.

## OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge:

## I. INTRODUCTION

On October 10, 2008, detectives from the Manhattan South Vice Enforcement Squad of the New York City Police Department ("NYPD") arrested Robert Pinter for prostitution, following an encounter between Pinter and Undercover Officer ("UC") 31107 at the Blue Door Video Store ("Blue Door"). At the end of a twenty-three hour post-arrest detention, and after having been awake for thirty-six hours, Pinter pled guilty to the lesser, non-criminal charge of disorderly conduct in exchange for a conditional discharge. Several months later, the state criminal court granted Pinter's motion to vacate his conviction and dismissed the accusatory instrument—actions the District Attorney's Office of New York County ("DANY") did not oppose.

In its response to Pinter's motion to vacate, DANY explained:

> It is unlikely that [Pinter] went to the location of the occurrence with the intent to solicit money for sex, as supported by his age (52 upon arrest), lack of prior record for prostitution-related offenses, and overall law-abiding history. Furthermore, the People recently dismissed three pending cases with circumstances similar to those of the case at bar because the People concluded that it would be difficult to prove the guilt of defendants in those cases beyond a reasonable doubt at trial.[1]

Thus, though DANY stated it believed there was probable cause for Pinter's arrest, it did not oppose vacatur and dismissal on fundamental fairness grounds.[2]

Pinter now brings federal and New York constitutional claims against the City of New York (the "City"), municipal officials and personnel, the officers involved in his arrest, and those officers' superiors.[3] Specifically, Pinter asserts that he was falsely arrested, maliciously prosecuted, subjected

---

1. Assistant District Attorney Gregory LeDonne's Affirmation and Response to Defendant Pinter's Motion to Vacate Conviction, *People v. Pinter*, No.2008NY075734 ("DANY Aff.") ¶ 5, Ex. H to the Declaration of James I. Meyerson, Pinter's Counsel ("Meyerson Decl.").

2. *See id.* ¶¶ 4, 6.

3. Pinter's federal claims are pursuant to Section 1983, which provides a remedy against "any person" who, under color of state law, deprives another of rights protected by the Constitution. 42 U.S.C. § 1983. In *Monell v. New York City Dept. of Soc. Servs.*, the Supreme Court held that Congress intended municipalities and other local government entities to be included among those persons to

to malicious abuse of the criminal process, discriminated against because of his sexual orientation, and denied his right to associate with Blue Door.[4] Pinter contends that these constitutional violations were proximately caused by "a municipal policy or practice or procedure [that] was promulgated and implemented for the collateral purpose of creating a data base of arrests to be utilized as evidence in independent civil nuisance abatement proceedings against, among others, Blue Door...."[5]

Pinter also alleges excessive force and unreasonable detention related to his being tightly rear handcuffed for a prolonged amount of time.[6] Pinter contends that these constitutional violations were proximately caused by "a municipal policy and practice [that] caused him to be driven around the City for [a] four to five hour period while being rear handcuffed rather than being delivered to a [NYPD] precinct for post arrest processing when and where he would have been unhandcuffed within a reasonable period of time after his arrest."[7] According to Pinter, the City is

the real party in interest in each of his claims.[8]

Despite the absence of any discovery other than Pinter's deposition,[9] defendants seek summary judgment on two principal grounds: (1) defendant Shari Hyman is entitled to absolute immunity as the official who initiated the nuisance abatement proceedings against Blue Door; and (2) because probable cause existed for Pinter's arrest, even on Pinter's version of the facts, the arresting officers and their superiors are entitled to qualified immunity on Pinter's false arrest claim.[10] Additionally, defendants argue that, absent an underlying constitutional violation, Pinter's corresponding municipal liability claim must fail.

For the purposes of this motion, Pinter's factual allegations are accepted as true. Defendants' motion is granted as to Hyman because Pinter's allegations do not establish that Hyman acted in an investigative or administrative role—rather than in performance of her quasi-prosecutorial functions—when she developed and imple-

whom Section 1983 applies. *See* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Court, however, concluded that municipalities may not be held liable "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691, 98 S.Ct. 2018.

4. *See* First Amended Complaint ("Compl.") ¶¶ 147–149 (First Cause of Action), ¶¶ 150–152 (Second Cause of Action), ¶¶ 153–155 (Third Cause of Action), ¶¶ 156–158 (Fourth Cause of Action), 159–161 (Fifth Cause of Action), ¶¶ 162–164 (Sixth Cause of Action), ¶¶ 165–168 (Seventh Cause of Action), ¶¶ 169–171 (Eighth Cause of Action), ¶¶ 178–180 (Eleventh Cause of Action), ¶¶ 181–183 (Twelfth Cause of Action).

5. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Mem.") at 2 n.2. *Accord* Compl. ¶ 86, ¶¶ 184–186 (Thirteenth Cause of Action), ¶¶ 187–189 (Fourteenth Cause of Action).

6. *See* Compl. ¶¶ 172–174 (Ninth Cause of Action), ¶¶ 175–177 (Tenth Cause of Action).

7. Pl. Mem. at 2 n.2. *Accord* Compl. ¶¶ 184–189.

8. *See Compl.* ¶¶ 190–192 (Fifteenth Cause of Action), ¶¶ 193–199 (Sixteenth Cause of Action).

9. The present summary judgment motion was briefed when this case was assigned to Judge Colleen McMahon. Pursuant to Rule 3.C of Judge McMahon's Individual Rules, "[a]s soon as a notice of motion raising the issue of qualified immunity is filed, all discovery is stayed except for the plaintiff's deposition." Accordingly, the briefing in this matter is generally pre-discovery.

10. *See infra* Part IV.C (discussing other claims).

mented the alleged policy of racking up false arrests to support the City's nuisance abatement litigation against businesses frequented by gay men. Defendants' motion is denied in all other respects because Pinter has alleged a violation of the clearly established right to be free from arrest without probable cause.

Under Pinter's version of the events and drawing all reasonable inferences in his favor, UC 31107 initiated contact with Pinter and the men agreed to consensual, gratuitous sex. Only after making that agreement and taking steps—literally—in furtherance' of it, did UC 31107 offer to pay Pinter fifty dollars to permit him to perform oral sex on Pinter. Pinter did not explicitly reject or accept the cash offer; rather, he remained silent. Though Pinter and the undercover continued speaking flirtatiously and walking toward the location where the sex act was to occur, this conduct cannot be understood apart from their prior agreement for sex gratis and the steps both men took toward consummating that arrangement. Given the totality of the circumstances, UC 31107 lacked probable cause to believe that Pinter had accepted a fee for professional services.

11. The background is based on the First Amended Complaint and Pinter's deposition—the factual allegations of which are accepted as true for the purposes of this motion—as well as documents incorporated into the Complaint or subject to judicial notice.

12. *See* Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1") ¶ 16; Plaintiff's Response to Defendants' Statement of Undisputed Facts and Counter–Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1") ¶ 16; Deposition of Plaintiff Robert Pinter ("Pinter Dep.") at 80–83, Ex. D to the Declaration of Tonya Jenerette, Defendants' Counsel ("Jenerette Decl.") and Ex. A to the Meyerson Decl.

13. *See* Def. 56.1 ¶ 17; Pl. 56.1 ¶ 13; Pinter Dep. at 4, 85.

## II. BACKGROUND [11]

### A. Pinter's Arrest and Detention

On his way home from a full day's work on October 10, 2008, Pinter stopped at Blue Door to pick up a video.[12] Blue Door is located at 87 First Avenue between Fifth and Sixth Streets in Manhattan—a few blocks from Pinter's home.[13] Blue Door rents and sells both general entertainment and adult films.[14]

Upon arriving at Blue Door at 7:00 p.m., Pinter proceeded to the adult section in the back of the store.[15] Vertical blinds separate the adult section from the general entertainment section.[16] As Pinter perused the kiosks in search of a video, he overheard a conversation between two men.[17] He looked into the aisle, and saw an older, tall man engaged in conversation with an attractive, younger man.[18] The younger man had his cell phone open and appeared to be inputting the older man's telephone number.[19] Pinter continued shopping.[20]

A few moments later, Pinter turned to see the same younger man staring at him from the end of the aisle.[21] Unbeknownst to Pinter, the younger man was an undercover police officer—UC 31107.[22] The older

14. *See* Def. 56.1 ¶¶ 19, 21–23; Pl. 56.1 ¶¶ 15, 17–19.

15. *See* Def. 56.1 ¶ 17; Pl. 56.1 ¶ 13.

16. *See* Def. 56.1 ¶ 22; Pl. 56.1 ¶ 18.

17. *See* Def. 56.1 ¶ 25; Pl. 56.1 ¶ 21.

18. *See id.*

19. *See* Def. 56.1 ¶ 26; Pl. 56.1 ¶ 21.

20. *See* Def. 56.1 ¶ 27; Pl. 56.1 ¶ 21.

21. *See id.*

22. *See* Def. 56.1 ¶ 25; Pl. 56.1 ¶ 21.

man with whom UC 31107 had been speaking was gone.[23]

Pinter and UC 31107 made eye contact, UC 31107 smiled at Pinter, and Pinter smiled back.[24] UC 31107 took a few steps toward Pinter.[25] Pinter then took a few steps toward UC 31107.[26] At that point, UC 31107 engaged Pinter in a flirtation and "suggested to [Pinter] that he was interested in engaging in a consensual sexual activity."[27] Specifically, UC 31107 complimented Pinter on his good looks and asked Pinter: "[W]hat do you like to do?"[28] Pinter responded: "[O]h, thank you, you're good looking too[,]"[29] and noted he both enjoyed—and was good at— fellatio.[30] UC 31107 told Pinter that he also enjoyed oral sex, but was nervous about doing it in the store.[31] UC 31107 told Pinter that his car was parked nearby.[32] "No mention of any money whatsoever was made at the time when [UC 31107] suggested that he and [Pinter] engage[] in a consensual sexual activity."[33] The undercover "was the initiator of the suggested activity."[34]

Pinter did not say anything but, instead, took a step toward the exit, expecting UC 31107 to follow him.[35] UC 31107 took a step toward the exit.[36] No words were exchanged during the "few seconds"[37] that the men were walking together toward the exit.[38] Under case law described below, this conduct is sufficient to infer that Pinter and UC 31107 reached an agreement for consensual, gratuitous sex and took steps in furtherance of that agreement.[39] Further to that point, I note that during the "few seconds" that elapsed between the men's conversation in the back of the store and their reaching the exit, Pinter obviously did not rent or purchase the video for which he had been searching.

At the door but before leaving the store, UC 31107 said to Pinter: "I want to pay you $50 to suck your dick."[40] Pinter did not say anything.[41] Pinter thought that UC 31107's offer was "suspicious" and "odd."[42] It also struck Pinter as strange that a younger, attractive man would want to pay him for sex.[43] At that point, Pinter decided

23. *See* Def. 56.1 ¶ 27; Pl. 56.1 ¶ 21.

24. *See* Pinter Dep. at 99.

25. *See id.*

26. *See id.*

27. Compl. ¶ 32. *Accord* Pinter Dep. at 100.

28. Pinter Dep. at 99.

29. *Id.*

30. *See id.*

31. *See id.* at 101.

32. *See id.*

33. Compl. ¶ 36. *Accord id.* ¶ 37.

34. *Id.* ¶ 38.

35. *See* Pinter Dep. at 101–102.

36. *See id.* at 105.

37. *Id.* at 108.

38. *See id.* at 106.

39. *See infra* Part IV.B.1.a. To the extent that Pinter alleges that he never consented to anything, *see* Compl. ¶ 41, this is irrelevant to the probable cause inquiry. That inquiry, as discussed below, focuses on the information apparent to UC 31107 when he ordered Pinter's arrest. Thus, Pinter's *uncommunicated* state of mind has no bearing on what UC 31107 knew.

40. *Id.* at 107.

41. *See id.* at 108.

42. *Id.* at 108–109.

43. *See* Christine Hauser, "Among Gay Men, Arrests Spark Concern of Being Singled Out," *N.Y. Times* (Feb. 15, 2009), Ex. I to Meyerson Decl.

that "[a]ny possibility of really engaging in anything with [UC 31107] was over[,]" though Pinter did not verbally communicate that decision.[44]

Upon exiting Blue Door together, UC 31107 motioned toward the east side of First Avenue and said " my car is parked over there[,]"[45] which was also in the direction of Pinter's apartment.[46] The men then proceeded to walk together north on First Avenue toward Sixth Street—toward UC 31107's car and Pinter's apartment.[47] As they walked, they engaged in a conversation about their penis sizes and playful banter about each other's age.[48]

Pinter and UC 31107 walked together to the corner of Sixth Street, crossed First Avenue heading east, and began walking east on Sixth Street.[49] From Blue Door, they covered a distance of fifty to one-hundred twenty-five feet.[50] During that time, Pinter felt free to walk away from UC 31107, but consciously decided not to do so.[51] Pinter never told UC 31107 that he did not wish to have oral sex with him or to receive money in exchange for it.[52]

Shortly after emerging onto Sixth Street, at approximately 7:15 p.m., two plain-clothes officers rushed toward Pinter, pushed him into a fence, and searched his pockets.[53] Pinter was arrested and rear handcuffed. The arresting officers were Detectives Jessica Sterling, Michael Michilena, Sandra Dailey, and Sergeant Michael Madison (collectively, the "Vice Detectives").[54]

Pinter was escorted to a police van, where an officer told Pinter that he was arrested for prostitution.[55] In response, Pinter said: " 'You've got to be kidding me. . . . I was in that store shopping for a DVD, I was minding my own business, your officer approached me, butted his nose into my business, and created this whole incident.' "[56]

Pinter was seat-belted onto a steel bench in the back of the van, still handcuffed.[57] As he was driven around, the van repeatedly braked and turned, causing

44. Pinter Dep. at 109–110.

45. *Id.* at 110.

46. *See id.* at 111.

47. *See id.* at 110–111.

48. *See id.* at 111–112.

49. *See id.* at 113.

50. *See id.* at 114, 116–117.

51. *See id.* at 115.

52. *See id.* at 113–114.

53. *See id.* at 117–119.

54. *See* Def. 56.1 ¶ 50; Pl. 56.1 ¶ 35.

55. *See* Pinter Dep. at 125–126.

56. *Id.* at 126. UC 31107 tells a very different story of the events leading to Pinter's arrest. In his Complaint Follow-up Informational, UC 31107 states:

I entered the building and walked to the back of the store. I saw a bunch of Dvd's on the shelves of pornographic material. I then saw JD short hair (Robert Pinter DOB: 11/23/55) standing around and looking at me. I then noticed that he was rubbing his groin area with his hand while staring at me. I then used my right hand and pulled out of my front right pants pocket some Pre recorded [sic] buy money and showed Robert. I then saw Robert look at my money, then look at me, then nod his head. I then approached Robert and engaged him in a sexual related conversation. Robert asked me what did I have for him. I told him I could give him $50 and asked him what did he like to do. He told me he enjoyed sucking cock and getting his cock sucked. I told him that I did not feel safe doing that in the store and if we could go to my car around the location and I led Robert to the field team where they detained him. I then gave all the details to Sgt. Madison and the field team of what had just transpired.

Ex. C to the Meyerson Decl.

57. *See Pinter Dep.* at 126, 130.

Pinter to jostle around and his handcuffs to tighten and tighten.[58] The cuffs also tightened when Pinter tried to adjust his wrists to a more comfortable position.[59] After about an hour, Pinter's hands grew cold and numb.[60] Pinter asked the two officers in the front of the van to either remove or loosen the cuffs.[61] One of the officers replied: "[N]o, we're not going to loosen them, we'll be at the precinct soon."[62] Approximately four to five hours after being placed in the van, Pinter was delivered to the Seventh Precinct for processing.[63]

At approximately 3:00 a.m. on October 11, Pinter was transported to Manhattan Central Booking.[64] Pinter was charged with a single count of prostitution in violation of Section 230.00 of the New York Penal Law.[65]

The following evening, at approximately 5:30 to 5:45 p.m., Pinter was retrieved from his cell for arraignment.[66] Pinter spoke very briefly with a Legal Aid attorney, who informed Pinter of his options.[67] Pinter then was arraigned by a criminal court judge, who informed Pinter of his right to a trial on the prostitution charge and explained the conditions and consequences of a plea.[68] Pinter—stressed about the ramifications of the prostitution charge, and having been awake for approximately thirty-six hours and having not eaten in nearly as long—pled guilty to the lesser charge of disorderly conduct, a noncriminal violation.[69] In exchange for this plea, Pinter was sentenced to a conditional discharge, five counseling sessions, and a mandatory $120 fine.[70]

On April 17, 2009, Pinter moved to vacate his conviction on the grounds that it was obtained in violation of his right to due process, fundamental fairness, and effective assistance of counsel.[71] DANY did not oppose Pinter's motion for the reasons stated above. DANY, however, stated that "the People believe that there was probable cause for [Pinter's arrest] and prosecution for the offense charged."[72] The criminal court granted Pinter's motion and dismissed the prostitution charge on June 22, 2009.[73]

### B. Nuisance Abatement Proceedings Against Blue Door

On April 21, 2008, the New York City Department of Buildings informed Dina Chiarelli, owner of the building located at 87 First Avenue, that the tenant Blue Door was in violation of the certificate of

---

58. *See id.* at 128.

59. *See id.*

60. *See id.*

61. *See id.* at 128–129, 131.

62. *Id.* at 131–132.

63. *See id.* at 136.

64. *See* Def. 56.1 ¶ 53; Pl. 56.1 ¶ 36.

65. *See* Def. 56.1 ¶ 49; Pl. 56.1 ¶ 35.

66. *See* Pinter Dep. at 150–151.

67. *See* Def. 56.1 ¶ 54; Pl. 56.1 ¶ 37.

68. *See* Def. 56.1 ¶ 55; Pl. 56.1 ¶ 37.

69. *See* Def. 56.1 ¶ 56; Pl. 56.1 ¶ 37. *See also* N.Y. Penal L. § 240.20 (Disorderly Conduct).

70. *See* Def. 56.1 ¶ 57; Pl. 56.1 ¶ 37; Transcript of 10/21/08 Proceedings Before Hon. Richard Weinberg, Criminal Court of the City of New York, 2008NY075734, at 2, Ex. F to the Jenerette Decl.; Transcript of 10/11/08 Proceedings Before Hon. James Gibbons, Criminal Court of the City of New York, 2008NY075734, at 3–7, Ex. C to the Jenerette Decl.

71. *See* Def. 56.1 ¶ 58; Pl. 56.1 ¶ 37.

72. DANY Aff. ¶ 4.

73. *See* Certificate of Disposition, No. 172236, *People v. Pinter,* Ex. G to Meyerson Decl.

occupancy for operating an adult entertainment theater in the building's cellar.[74] Additionally, ten arrests for prostitution and one arrest for possession of marijuana were made at Blue Door between February and June 2008.[75]

On June 12, 2008, the New York City Mayor's Office of Special Enforcement, under the direction of defendant Shari Hyman, commenced an action pursuant to Chapter 7 of Title 7 of the New York City Administrative Code (the "Nuisance Abatement Law") to abate a public and criminal nuisance at Blue Door.[76] Nuisance abatement proceedings address continuous public health, criminal, or unlawful conditions at a premises, not the isolated criminal activities of any individual.[77]

On June 20, 2008, Chiarelli and Blue Door entered into a stipulation of settlement with the City (the "June 20 Settlement").[78] Blue Door agreed to take certain actions to abate the nuisance, including installing surveillance cameras and posting signs forbidding prostitution in the store.[79] The Settlement also provided that there would be periodic, unannounced investigations of the premises by undercover NYPD officers to ensure Blue Door's compliance.[80]

In the months after the parties agreed to settle the nuisance abatement proceedings against Blue Door, investigations by undercover NYPD officers resulted in two additional prostitution arrests—one of those being Pinter's arrest.[81] On November 19, 2008, the Office of Special Enforcement moved to vacate the June 20 Settlement on the grounds that those two arrests violated the settlement terms.[82] The court issued an order to show cause why the settlement should not be vacated.[83]

On December 17, 2008, Blue Door and the Office of Special Enforcement entered into a stipulation of settlement in which Blue Door: (1) admitted that the allegations set forth in the City's November 19, 2008 motion to vacate were true; and (2) agreed to pay a fine of $5,000 and to post a bond of $40,000.[84] On April 2, 2009, the City and Chiarelli entered into a final stipulation of settlement closing the nuisance abatement proceeding against 87 First Avenue.[85]

## C. Events Subsequent to Pinter's Arrest

At the counseling sessions to which Pinter was sentenced, Pinter met other gay and bisexual men arrested under remarkably similar circumstances.[86] Pinter learned that UC 31107 was involved in "dozens of arrests of older gay men . . . at locations frequented by gay men."[87] Pinter also learned that some of the men were not even New Yorkers.[88] Pinter collected

74. *See* Def. 56.1 ¶ 60; Pl. 56.1 ¶ 41.

75. *See* Def. 56.1 ¶ 63; Pl. 56.1 ¶ 41.

76. *See* Def. 56.1 ¶ 61; Pl. 56.1 ¶ 41.

77. *See* Def. 56.1 ¶ 62; Pl. 56.1 ¶ 41.

78. *See* Def. 56.1 ¶ 64; Pl. 56.1 ¶ 41.

79. *See* Def. 56.1 ¶ 65; Pl. 56.1 ¶ 41.

80. *See id.*

81. *See* Def. 56.1 ¶ 67; Pl. 56.1 ¶ 41.

82. *See* Def. 56.1 ¶¶ 66–67; Pl. 56.1 ¶ 41.

83. *See* Def. 56.1 ¶ 68; Pl. 56.1 ¶ 41.

84. *See* Def. 56.1 ¶¶ 70–71; Pl. 56.1 ¶ 41.

85. *See* Def. 56.1 ¶ 72; Pl. 56.1 ¶ 41.

86. *See* Compl. ¶ 80.

87. *Id.* ¶ 82. *Accord id.* ¶¶ 84, 105, 121.

88. *See id.* ¶ 105 ("[E]ight of the twelve men arrested during the relevant period of time at [Blue Door] were forty-two years of age or older. . . . [T]wo of the twelve were from other states—California and Virginia, and another two, a couple, were from Europe.").

data and educated the gay community about the pattern of arrests.[89]

A public controversy thereafter erupted, with activists from the gay community charging that the arrests were obtained through entrapment and that the NYPD was targeting gay men. On February 11, 2009, Pinter and other activists attended a meeting with local officials at the office of City Council Speaker Christine Quinn.[90] Defendant Deputy Chief Brian Conroy, the Commanding Officer of the NYPD Vice Enforcement Division, defendant Hyman, the Director of the Mayor's Office of Special Enforcement,[91] Anthony Crowell, Counsel to Mayor Bloomberg, and William Heinzen, Assistant Corporation Counsel of the City, were also in attendance.[92] During the meeting, Conroy stated in substance—in Pinter's presence—"that the policy, practice and approach related to the arrests associated with the City's nuisance abatement legal efforts, might not be working and that a different policy, practice, [and] approach might be necessary."[93] Conroy further stated in substance that the present policy had been "paused."[94]

On March 6, 2009, community activists met with state Senator Thomas Duane and then-District Attorney Robert Morgenthau.[95] Morgenthau vowed that his office would investigate the arrests. In fact, in early February 2009, at the latest, DANY launched two separate investigations into the arrests—one focused on wrongdoing by UC 31107 and two other officers, the other focused on the viability of the prostitution charges.[96] While DANY declined to criminally charge any of the police officers, DANY dismissed a number of the prostitution prosecutions. Beyond those cases that were dismissed, DANY identified at least twenty-two arrests stemming from common circumstances.[97] The majority of those men, however, had already pled guilty to disorderly conduct by the time DANY investigated the arrests.[98]

Also in March 2009, defendant Police Commissioner Raymond Kelly convened a meeting with high-ranking NYPD officials, including various defendants here.[99] At this point, "procedures were put into place to address the problems and concerns about the unjustified, probable cause lacking false arrests which were being made because of the City's nuisance abatement litigation policy and practice with respect [to] adult video stores."[100]

### D. Municipal Policy Allegation

According to the Complaint, Pinter was among at least thirty men arrested by NYPD Vice Squad officers in six adult video stores during 2008 and whose arrests were utilized by the City in its nuisance abatement litigation against those stores.[101] Such litigation was brought by

89. *See id.* ¶ 81.

90. *See id.* ¶ 91.

91. *See id.* ¶¶ 91, 94.

92. *See id.* ¶¶ 91–94.

93. *Id.* ¶ 93.

94. *Id.* ¶ 91. *Accord id.* ¶ 92.

95. *See id.* ¶ 107; Duncan Osborne, "Manhattan DA Pledges to Investigate Gay Men's Prostitution Arrests," *Gay City News* (Mar. 8, 2009), Ex. I to Meyerson Decl.

96. *See Crosby v. City of New York,* Nos. 09 Civ. 9693, 09 Civ. 9694, 09 Civ. 9695, ——

F.Supp.2d ——, ——, 2010 WL 2541097, at *1 (S.D.N.Y. June 22, 2010) (denying in part and granting in part DANY's motion to quash plaintiffs' subpoenas).

97. *See id.* at ——–——, at *8–*10.

98. *See id.* at ——, at *1.

99. *See* Compl. ¶ 108.

100. *Id.* ¶ 109.

101. *See id.* ¶ 88. *See also id.* ¶ 104 ("[NYPD officers] arrested fifty-two men in eight different Manhattan adult video store dating back to 2004 and, citing the arrests, the City has

the Office of Special Enforcement or the NYPD's Legal Bureau—offices that cooperated with each other.[102]

The undercover "technique" more or less utilized to obtain all of the arrests was as follows:

> [T]he Undercover Officer approach[es] an individual in an adult video store, the Undercover initiat[es] flirtation and initiat[es] conversation regarding sex, the Undercover suggest[s] the individual leave the store to have sex in the Undercover's car outside of that store, and the Undercover, then, as the individuals were leaving the store, mention[s] giving money to the individual for the sexual activity.
>
> Once out of the store and after proceeding some short distance and without the individual ever agreeing to the sexual activity or to receiving or giving monies as had been mentioned by the Undercover, the individual is bum rushed by the "arrest team" and charged with prostitution.[103]

Based on all of the factual allegations described above, Pinter alleges that his and the other arrests:

> were actually designed not to make legitimate, probable cause based arrests

but were made for the collateral purpose of endeavoring to shut down numerous video stores, which were ... regularly frequented by ... members of the gay and lesbian and bi-sexual and transgender communities, for which there had been complaints received by the City to shut down those otherwise legitimate business operations.[104]

Pinter alleges that such a policy "emanated from the highest levels" of City government.[105]

## III. APPLICABLE LAW

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[106] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'"[107] "[T]he burden of demonstrating that no material fact exists lies with the moving party...."[108]

---

brought nuisance abatement lawsuits against seven of the eight businesses....").

102. *See id.* ¶¶ 96–98.

103. *Id.* ¶¶ 99–100. *See also id.* ¶ 101.

104. *Id.* ¶ 88. Pinter's allegations mirror the plaintiffs' allegations in three related cases. *See Crosby,* —— F.Supp.2d at ——, 2010 WL 2541097, at *1 ("Plaintiffs here are four of the men arrested for prostitution. According to the complaints, the charges against each were dropped. Plaintiffs allege that their arrests not only were baseless, but were part of an unconstitutional program by New York City to pursue nuisance abatement lawsuits against businesses by making false arrests for prostitution at the business sites, then using the fact of those arrests to bolster the City's

efforts to close those businesses—in these cases, a pornography shop and a spa. Indeed, say plaintiffs, their *arrests* (as opposed to convictions) were listed, among others, in affidavits in support of the City's lawsuits to shut down the Unicorn DVD Store and the Miracle Spa." (footnotes omitted)).

105. Compl. ¶ 135.

106. Fed.R.Civ.P. 56(c).

107. *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009) (quoting *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008))

108. *Miner v. Clinton County, N.Y.,* 541 F.3d 464, 471 (2d Cir.2008).

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[109] As explained below, when determining a motion on immunity grounds in advance of full discovery, the plaintiff's version of the facts is presumed to be true.[110]

## B. Immunity from Federal Causes of Action

"[G]overnment officials are entitled to some form of immunity from suits for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability."[111] "In the case of legislators, judges, and certain executive officials such as prosecutors, the protection usually takes the form of absolute immunity from liability for damages."[112] "In the case of most executive employees, however, the protection takes the form of 'qualified immunity,' *i.e.*, immunity from liability if the employee was acting in subjective and objective good faith."[113]

### 1. Absolute Immunity

■ "The real distinction between whether an executive employee is entitled to absolute or qualified immunity turns on the kind of function the employee is fulfilling in performing the acts complained of. This is what the Supreme Court has called a 'functional' analysis."[114] "Those [prosecutorial] acts that are 'intimately associated with the judicial phase of the criminal process' [are] shielded by absolute immunity, but not 'those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate.' "[115] The Second Circuit has extended absolute immunity to state and federal officials advocating in noncriminal proceedings such as administrative proceedings and civil litigation.[116]

Because the Second Circuit has described the task of distinguishing between "investigative" and "advocacy" functions as "vexed,"[117] I briefly review two leading

---

109. *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir.2009).

110. See *Bizzarro v. Miranda*, 394 F.3d 82, 86–88 (2d Cir.2005) ("[I]f [plaintiff's] version of the facts reveals that defendants did not violate [plaintiff's] constitutional rights at all, the defendants are entitled to have the case dismissed.").

111. *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Accord *Cornejo v. Bell*, 592 F.3d 121, 124, 127 (2d Cir.2010).

112. *Cornejo*, 592 F.3d at 124.

113. *Id.*

114. *Id.* at 127 (quoting *Briscoe v. LaHue*, 460 U.S. 325, 342, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)). Accord *Harlow*, 457 U.S. at 810, 102 S.Ct. 2727 ("Our cases have followed a 'functional approach to immunity law.' ").

115. *Warney v. Monroe Cty.*, 587 F.3d 113, 121 (2d Cir.2009) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

116. *See, e.g., Cornejo*, 592 F.3d at 127–28 (holding that attorneys for New York City Administration for Children's Services were entitled to absolute immunity for initiating proceedings removing a child from the parents' custody); *Barrett v. United States*, 798 F.2d 565, 572 (2d Cir.1986) (holding that government attorney defending civil suit entitled to absolute immunity); *Walden v. Wishengrad*, 745 F.2d 149, 152 (2d Cir.1984) (holding that attorney for county Department of Social Services who "initiates and prosecutes child protective orders and represents the interests of the Department and the County in Family Court" entitled to absolute immunity).

117. *Warney*, 587 F.3d at 121.

Supreme Court cases on either side of that tangled line. In *Burns v. Reed*, the Supreme Court held that a prosecutor "advising the police in the investigative phase of a criminal case is [not] so 'intimately associated with the judicial phase of the criminal process'" to be entitled to absolute immunity.[118] Nor did the risk of vexatious litigation "support absolute immunity for giving legal advice."[119] "Absolute immunity is designed to free the *judicial process* from the harassment and intimidation associated with litigation. That concern therefore justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct."[120] Finally, while the Court observed that several checks other than civil litigation existed to prevent abuses of authority by prosecutors, it "note[d] that one of the most important checks, the judicial process, will not necessarily restrain out-of-court activities by a prosecutor that occur prior to the initiation of a prosecution, such as providing legal advice to the police."[121]

More recently, in *Van de Kamp v. Goldstein*, the Supreme Court confronted allegations that the Los Angeles County District Attorney and his chief assistant failed to (1) properly train and supervise prosecutors with respect to their obligations to disclose impeachment material pursuant to *Giglio v. United States* [405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ], and (2) establish a system by which prosecutors could share information about jail-house informants.[122] Holding that absolute immu-

nity attached to such functions, the Court explained:

> Here, unlike with other claims related to administrative decisions, an individual prosecutor's error in the plaintiff's specific criminal trial constitutes an essential element of the plaintiff's [Section 1983] claim. The administrative obligations at issue here are thus unlike administrative duties concerning, for example, workplace hiring, payroll administration, the maintenance of physical facilities, and the like. Moreover, the types of activities on which Goldstein's claims focus necessarily require legal knowledge and the exercise of related discretion, *e.g.*, in determining what information should be included in the training or the supervision or the information-system management. And in that sense also Goldstein's claims are unlike claims of, say, unlawful discrimination in hiring employees. Given these features of the case before us, we believe absolute immunity must follow.[123]

The Second Circuit has interpreted *Van de Kamp* to hold that "a prosecutor enjoys absolute immunity even when doing an administrative act if the act is done in the performance of an advocacy function." [124]

■ "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."[125] The Supreme Court has been "quite sparing" in its recognition of absolute immunity, because "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect

---

118. 500 U.S. 478, 483, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (quoting *Imbler*, 424 U.S. at 430, 96 S.Ct. 984) (citation omitted).

119. *Id.*

120. *Id.* (emphasis added and citation omitted).

121. *Id.* at 496, 111 S.Ct. 1934.

122. *See* —— U.S. ——, 129 S.Ct. 855, 858–59, 172 L.Ed.2d 706 (2009).

123. *Id.* at 862.

124. *Warney,* 587 F.3d at 124.

125. *Burns,* 500 U.S. at 486, 111 S.Ct. 1934.

government officials in the exercise of their duties."[126]

## 2. Qualified Immunity

■ "Qualified immunity is an affirmative defense designed to protect the defendant public official not just from liability but also from suit thereby sparing him the necessity of defending by submitting to discovery on the merits or undergoing a trial."[127] "Qualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[128] "A police officer who has an objectively reasonable belief that his actions are lawful is entitled to qualified immunity."[129] In all cases, the qualified immunity analysis mandates a fact-specific inquiry.

■ "In order to overcome a qualified immunity defense, a plaintiff must demonstrate that '[t]aken in the light most favorable to the [plaintiff,] . . . the facts alleged show [that] the officer's conduct violated a constitutional right,' and that the right allegedly violated was 'clearly established.' "[130] "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[131] Under *Pearson v. Callahan*, courts have discretion to determine which of the two qualified immunity prongs to address first.[132]

The Second Circuit has framed the "objectively reasonable" inquiry as separate from the "clearly established" inquiry, thus necessitating that a plaintiff overcome three hurdles to survive a qualified immunity defense:

[A] government official sued in his individual capacity . . . is entitled to qualified immunity in any of three circumstances: (1) if the conduct attributed to him is not prohibited by federal law . . . ; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct . . . ; or (3) if the defendant's action was objectively legally reasonable . . . in light of the legal rules that were clearly established at the time it was taken.[133]

Yet, the Second Circuit has held the "inquiry into whether it was objectively

---

126. *Id.*

127. *Amore v. Novarro*, 610 F.3d 155, 161 (2d Cir.2010) (quotation marks and alterations omitted). Accord *Jenkins v. City of New York*, 478 F.3d 76, 87 n. 9 (2d Cir.2007) ("[Qualified immunity] is 'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.' " (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985))).

128. *Taravella v. Wolcott*, 599 F.3d 129, 133 (2d Cir.2010) (quotation marks omitted). Accord *Pearson v. Callahan*, —— U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

129. *Okin v. Village of Cornwall–On–Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir.2009).

130. *Amore*, 610 F.3d at 162 (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled in part on other grounds*, *Pearson*, —— U.S. ——, 129 S.Ct. 808, 172 L.Ed.2d 565).

131. *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151.

132. *See Pearson*, 129 S.Ct. at 818. *Pearson* recognized, however, that the traditional sequence "is often appropriate." *Id.*

133. *X–Men Sec., Inc. v. Pataki*, 196 F.3d 56, 65–66 (2d Cir.1999). *Accord Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir.2010); *Taravella*, 599 F.3d at 135; *Cornejo*, 592 F.3d at 128; *Gilles v. Repicky*, 511 F.3d 239, 246 (2d Cir.2007).

reasonable for an officer to believe that his conduct did not violate a constitutional right [to be] part of the inquiry into whether the constitutional right allegedly violated was 'clearly established.' "[134] In *Okin v. Village of Cornwall–On–Hudson Police Department*, the court explained:

> Some cases frame the test as disjunctive: an officer is entitled to qualified immunity if his conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for him to believe that his conduct did not violate such a right. This would imply that an officer whose actions violated clearly established law might escape liability if he had an objectively reasonable belief that his conduct did not violate the clearly established law. However, *Saucier* makes it clear that the "objectively reasonable" inquiry is part of the "clearly established" inquiry. Thus, once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for a police officer who violated this clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful. This is so because a police officer who violates clearly established law necessarily lacks an objectively reasonable belief that his conduct was lawful. We clarify here that the two are part of the same inquiry, not indepen-

dent elements as some cases suggested.[135]

Nonetheless, a year later in *Taravella v. Wolcott*, a panel of the Second Circuit rejected the two-part inquiry.[136] Calling the "third question indispensible[,]"[137] the majority held that the defendant was entitled to qualified immunity because, although the plaintiff had alleged a violation of a clearly established constitutional right, the defendant's conduct was objectively reasonable.[138] In a forceful and thorough dissent, Judge Chester Straub—quoting then-Judge Sonia Sotomayor's concurrence in *Walczyk v. Rio*—explained:

> Contrary to what our case law might suggest, the Supreme Court does not follow [the] 'clearly established' inquiry with a second, ad hoc inquiry into the reasonableness of the officer's conduct. Once we determine whether the right at issue was clearly established for the particular context that the officer faced, the qualified immunity inquiry is complete.
>
> [W]hether a right is clearly established is the same question as whether a reasonable officer would have known that the conduct in question was unlawful. This Court's case law, in contrast, bifurcates the 'clearly established' inquiry into two steps. . . . By splitting the 'relevant, dispositive inquiry' in two, we erect an additional hurdle to civil rights claims against public officials that has no basis in Supreme Court precedent.[139]

**134.** *Amore*, 610 F.3d at 162.

**135.** *Okin*, 577 F.3d at 433 n. 11. *Accord Seri v. Bochicchio*, 374 Fed.Appx. 114, 115–17 (2d Cir.2010); *Taravella*, 599 F.3d at 135 (Straub, J., dissenting); *Walczyk v. Rio*, 496 F.3d 139, 166–67 (2d Cir.2007) (Sotomayor, J., concurring).

**136.** *See Taravella*, 599 F.3d at 134 (" '[E]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objec-

tively reasonable' for him at the time of the challenged action to believe his acts were lawful.' " (quoting *Higazy v. Templeton*, 505 F.3d 161, 169–70 (2d Cir.2007)) (alteration in original)).

**137.** *Id.* at 135.

**138.** *See id.* at 133–35.

**139.** *Id.* at 135 (Straub, J., dissenting) (quoting *Walczyk*, 496 F.3d at 166–67 (Sotomayor, J., concurring)).

Given the inconsistent directives from the circuit,[140] and, more importantly, because I "owe fidelity to the [Supreme] Court's articulation of the [qualified immunity] test,"[141] I do not analyze the reasonableness of UC 31107's conduct apart from the clearly established inquiry. I address this issue in the context of this case in further detail below.

### C. Immunity from State Causes of Action

■■■ The doctrine of qualified immunity is generally understood to only protect government officials from federal, not state, causes of action.[142] A similar doctrine, however, exists under New York common law, which grants "government officials qualified immunity on state-law claims except where the official's actions are undertaken in bad faith or without a reasonable basis." [143] Thus, generally a defendant who is entitled to qualified immunity on a federal claim is also immune from suit on the same claim under state law.[144] "However, the reasonableness of an officer's action is judged with references to state law and the state, not the federal, constitution." [145]

## IV. DISCUSSION

### A. Defendant Hyman Is Entitled to Absolute Immunity

■■■ Defendant Hyman—Director of the Office of Special Enforcement, which prosecuted the nuisance abatement proceedings against Blue Door—asserts that she is entitled to absolute immunity. As discussed above, to establish absolute immunity, the ultimate question is whether Hyman has carried her burden of establishing that she was functioning as an "advocate" when she engaged in the challenged conduct.[146] " 'A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity.' "[147]

Pursuant to Sections 7–704 and 7–706 of the New York City Administrative Code, the City is authorized to bring and maintain an action in the state Supreme Court to permanently restrain public nuisances and the persons conducting or permitting the nuisance to occur.[148] The Nuisance Abatement Law also provides for the granting of certain ex parte temporary

---

140. *See, e.g., Amore*, 610 F.3d at 162 ("recognizing tension in the case law as to [w]hether the 'objectively reasonable' inquiry is framed as part of the 'clearly established' inquiry, or apart from it. . . ."); *Taravella*, 599 F.3d at 135 (Straub, J., dissenting) ("I wish to call the Court's attention to what appears to me to be a long standing inconsistency in our case law."); *Walczyk*, 496 F.3d at 165 (Sotomayor, J., concurring) ("I write separately to call the Court's attention to our collective failure to harmonize our qualified immunity analysis with the Supreme Court's directives.").

141. *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir.2009) ("[W]e adopt the [Supreme] Court's two-part test and abandon our previous usage of a three-step analysis.").

142. *See Jenkins*, 478 F.3d at 86.

143. *Papineau v. Parmley*, 465 F.3d 46, 63 (2d Cir.2006).

144. *See Jenkins*, 478 F.3d at 87 ("If the detective defendants were entitled to qualified immunity under federal law, summary judgment would be similarly appropriate on Jenkins' [sic] state law false arrest claim.").

145. *5 Borough Pawn, LLC v. City of New York*, 640 F.Supp.2d 268, 286 (S.D.N.Y.2009).

146. *See Warney*, 587 F.3d at 112 (*quoting Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir.1996)).

147. *Id.* (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)).

148. *See also* N.Y.C. Admin. Code §§ 7–701 (providing legislative declaration), 7–703 (defining "public nuisance").

relief where the City presents "clear and convincing evidence" of a public nuisance affecting "the public health, safety or welfare." [149]

Furthermore, under Section 2321 of the New York Public Health Law, the City is authorized to maintain an action in equity in the name of the People of the State of New York in the Supreme Court in the county where the nuisance is located. Section 2321(4) authorizes the issuance of both an ex parte restraining order and a preliminary injunction where necessary to restrain a continuing public nuisance.

According to defendants, "[Hyman] represents the interests of the City and the public health in initiating nuisance abatement proceedings against establishments that maintain or permit prostitution and other acts inimical to the public health and safety to take place on their premises." [150] Defendants argue that because Pinter challenges actions taken by Hyman in that quasi-prosecutorial role—initiating two nuisance abatement proceedings against Blue Door—she is entitled to absolute immunity. [151]

Pinter, however, argues that he "does not challenge the legitimacy of the City's civil nuisance abatement litigation program." [152] Instead:

> [Pinter challenges Hyman's] policy making conduct, as an executive and not a prosecutor or quasi prosecutor, which policy making functions for the agency, while inter-related to the civil nuisance abatement litigation program, were not prosecutorial or quasi prosecutorial in nature and do not therefore implicate or trigger an absolute immunity defense any more so than a district attorney, as the chief executive of his or her office, would have absolute immunity for promulgating and adopting certain office policies associated with the otherwise legitimate performance of his subordinate's prosecutorial functions for which the subordinate, in function [sic] as a prosecutor, might possess absolute immunity. [153]

Specifically, Pinter argues that Hyman and other defendants created and implemented "policies which propelled unlawful arrests of individuals in order to secure the requisite arrest data necessary to succeed in the otherwise lawfully commenced civil nuisance abatement litigations." [154] Pinter further asserts that his arrest was part of a pattern of false arrests that immediately found their way into civil nuisance abatement proceedings against adult video stores and other businesses frequented by gay men. [155]

In her capacity as Director of the Office of Special Enforcement, Hyman undoubtedly has job functions apart from initiating

---

149. *Id.* §§ 7–707(a) and 7–710(a).

150. Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def. Mem.") at 20.

151. Defendants also argue that Pinter's allegations as to Hyman contradict the "substantial weight of administrative and judicial determinations that Blue Door created a public nuisance." *Id.* at 22. Defendants' argument cannot be credited at this time. Pinter's arrest was part of the "evidence" against Blue Door. Viewing Pinter's allegation of a false arrest as true means that at least some of the evidence gathered against Blue Door was also false. Thus, whether Blue Door was in fact creating a public nuisance is disputed.

152. Pl. Mem. at 13.

153. *Id.* at 13–14. The submissions prepared by Pinter's counsel in this matter are replete with sentences of breath-taking duration and excessive clauses. The use of a period now and then might ease the task of a busy court striving to give full consideration to each counsel's arguments.

154. *Id.* at 12 n. 17.

155. *See, e.g.,* Compl. ¶ 133.

nuisance abatement proceedings, including setting the policy and priorities that govern her staff and their coordination with other branches of law enforcement. While Pinter's allegations about the existence of the alleged unconstitutional policy are not bald and conclusory,[156] he makes no allegations concerning the function in which Hyman acted when she issued that policy.

Even accepting Pinter's allegations as true, the challenged action—the development and implementation of a policy of obtaining arrests to sustain and advance the City's nuisance abatement program—appears from the present allegations to be so entwined with Hyman's advocacy function that she is entitled to absolute immunity.[157] Indeed, Pinter's own arrest appears to have resulted from the provision in the June 20 Settlement between the City, Blue Door, and Chiarelli that provided for unannounced NYPD investigations on the premises.

That said, Hyman *may have* instead been functioning in an investigatory role when she promulgated and implemented the alleged policy, akin to when a prosecutor provides advice to the police during the investigative phase of a criminal case.[158] If Pinter discovers that Hyman acted in an investigatory capacity—and such an act was not "integral" to her advocacy functions[159]—then he may amend his Complaint accordingly. Should that occur, it will be necessary for me to revisit the question of whether Hyman is entitled to absolute immunity.

## B. UC 31107, the Vice Detectives, and Their Superiors Are Not Entitled to Qualified Immunity

### 1. False Arrest

Turning to qualified immunity, I first address whether Pinter alleges a constitutional violation in the form of false arrest—that is whether, on Pinter's account of the facts, probable cause existed to arrest him for prostitution.[160]

### a. Pinter Alleges a Constitutional Violation

■■ The elements of a claim for false arrest under Section 1983 "are substantially the same as the elements of a false arrest claim under New York law."[161] Un-

---

**156.** Pinter's policy allegation is anchored to his factual allegations regarding, *inter alia*: (1) the similar circumstances surrounding the arrests of numerous men for prostitution—similarities DANY recognized and acted upon—(2) statements made by NYPD officials regarding the existence of an arrest policy related to nuisance abatement lawsuits, and (3) connections between the Office of Special Enforcement and such an arrest policy. *See supra* Part II.C & II.D.

**157.** *See Van de Kamp*, 129 S.Ct. at 858–59; *Warney*, 587 F.3d at 124.

**158.** *See Burns*, 500 U.S. at 483–86, 111 S.Ct. 1934.

**159.** *Warney*, 587 F.3d at 124.

**160.** Defendants do not assert that any ground beyond prostitution existed for the arrest of Pinter. Therefore, *Devenpeck v. Alford* is inapposite. In *Devenpeck*, the Supreme Court held that an officer's subjective intent for an arrest is irrelevant: Even if probable cause did not exist with respect to the stated basis for the arrest, the arrest is valid if any valid basis existed. *See* 543 U.S. 146, 153–56, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). *Accord Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) ("[I]t is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of the arrest."). The Court in Devenpeck reasoned that a contrary holding would create "arbitrary consequences." *Id.* at 155, 125 S.Ct. 588. If two officers arrest a suspect on identical facts supporting probable cause, one arrest could be constitutional and the other unconstitutional if the latter officer failed to identify correctly "a general class of offense for which probable cause exists." *Id.* at 154, 125 S.Ct. 588.

**161.** *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir.1995) (quotation marks omitted).

der New York law, the elements of a false arrest claim are: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.[162] An arrest is privileged when probable cause exists for the individual's arrest.[163] Likewise, "[t]here can be no federal civil rights claim for false arrest where the arresting officer had probable cause." [164]

"The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." [165] However, where a plaintiff has alleged a constitutional violation and where the defendants' version of the facts is materially different, a trier of fact must determine the issue, provided the plaintiff survives the the second prong of the qualified immunity analysis.[166]

 "Probable cause exists when, based on the totality of circumstances, the officer has 'knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.' " [167] The inquiry into probable cause "is an objective one that focuses on the facts available to the arresting officer at the time of the arrest."[168] "Before making an arrest, if the arresting officer has probable cause, he need not also believe with certainty that the arrestee will be successfully prosecuted."[169] Nor does the validity of an arrest depend upon the ultimate adjudication of guilt or innocence.[170] Probable cause is "an assessment of probabilities, not an ascertainment of truths."[171] "[Probabilities] are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act. . . . The substance of all the definitions of probable cause is a reasonable ground for belief of guilt."[172] Probable cause, however, "requires more than a 'mere suspicion' of wrongdoing[.]" [173]

 Here, Pinter was arrested and charged with the Class B Misdemeanor of prostitution in violation of Section 230.00 of the New York Penal Law.[174] Section 230.00 provides:

162. *See id.*

163. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996).

164. *Singer,* 63 F.3d at 118 (quotation marks and citations omitted).

165. *Weyant,* 101 F.3d at 852.

166. *See id.*

167. *Finigan v. Marshall,* 574 F.3d 57, 62 (2d Cir.2009) (quoting *Zellner v. Summerlin,* 494 F.3d 344, 368 (2d Cir.2007)).

168. *Id.*

169. *Curley v. Village of Suffern,* 268 F.3d 65 (2d Cir.2001).

170. *Brogdon v. City of New Rochelle,* 200 F.Supp.2d 411, 419 (S.D.N.Y.2002) (*citing Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)).

171. *Loria v. Gorman,* 306 F.3d 1271, 1288–89 (2d Cir.2002).

172. *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (*quotation marks omitted*). *Accord Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).

173. *Walczyk,* 496 F.3d at 157 (*quoting Mallory v. United States,* 354 U.S. 449, 455, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957)).

174. To be clear, Pinter was *not* charged with solicitation of a prostitute, which is a separate crime. *See* N.Y. Penal L. §§ 230.02–230.06.

A person is guilty of prostitution when such person engages or agrees or offers to engage in sexual conduct with another person in return for a fee.[175]

Citing *Black's Law Dictionary*, New York courts have defined the statutory term "agree" to mean " 'concur, . . . give mutual assent; unite in mental action.' "[176] Similarly, an "agreement" is a "mutual understanding between two or more persons about their relative rights and duties regarding past or future performances" or "a manifestation of mutual assent by two or more persons."[177]

In *People v. A.S.*, a state trial court stated that "acts of agreement showing defendant's intent to consummate an act of prostitution" include "taking a step toward committing the act" such as "accepting the consideration or accompanying the undercover officer to a place whether the sexual act might occur . . . ."[178] Of course, as the court recognized in *People v. A.M.*—a case with obvious similarities to Pinter's—it is crucial to distinguish between non-commercial sexual encounters and acts of prostitution.[179] In so doing, context matters:

Christopher Street and the Westside Highway, where this incident is alleged to have occurred, has long been known as a place where gay men are able to meet and socialize. The danger exists that an encounter in which an individual is simply making contact with another, perhaps for purposes of consensual sex, may, due to the ambiguities attendant to such encounters, be misconstrued or misunderstood by a police officer to be a prostitution offense.[180]

Viewing Pinter's version of events as true and drawing all reasonable inferences in his favor, UC 31107 did not have probable cause to arrest Pinter for prostitution. Defendants argue that UC 31107 reasonably believed that Pinter's actions, *following* the moment he (UC 31107) offered money for sex to Pinter, manifested Pinter's assent to a fee offer. Pinter did not explicitly reject UC 31107's offer; rather, Pinter remained silent and continued walking with the undercover toward the location where the sex act was to take place. The men also continued to talk in a flirtatious and sexual manner.

---

175. N.Y. Penal L. § 230.00. The gender of the parties is immaterial to a prostitution charge. *See id.* § 230.10.

176. *People v. A.S.*, 179 Misc.2d 569, 685 N.Y.S.2d 573, 574 (Crim.Ct.N.Y.City.1998) (quoting *Black's Law Dictionary* (6th ed. 1990)). *Accord People v. Rodas*, No. 2009NY085293, 26 Misc.3d 1241(A), 2010 WL 1136506, at *2 n. 1 (Crim Ct. N.Y. City Mar. 26, 2010) (quoting *Black's Law Dictionary* (8th ed. 2004)); *People v. A.M.*, No.2001CN001284, 2001 WL 1117455, at *2 (Crim. Ct. N.Y. City July 31, 2001) (quoting *Black's Law Dictionary* (7th ed. 1999)).

177. *A.M.*, 2001 WL 1117455, at *2 (quotation marks omitted).

178. 685 N.Y.S.2d at 574. Similarly, in *A.M.*, the court explained that "[w]ords or acts of the defendant which provide a reliable basis to believe that the defendant actually entered into and accepted the terms of [an agreement to exchange sex for a fee]" include "whether the defendant said something indicating he would exchange sex for remuneration, whether he discussed fees, whether he suggested a location for the act, whether he nodded his head or made some other affirmative gesture, or whether he accepted money." 2001 WL 1114755, at *4 (citing *Matter of Marco M.*, 158 A.D.2d 342, 551 N.Y.S.2d 204 (1st Dep't 1990)).

In *Marco M.*, the First Department held that the defendant agreed to engage in sex for a fee where the defendant nodded in agreement to the offer, voluntarily entered an unmarked police van, responded "no problem, you'll have a good time" to an officer's statement that he wanted to "get laid", and discussed the fee directly with the officer. 551 N.Y.S.2d at 204.

179. *See* 2001 WL 1114755, at *4.

180. *Id.*

However, narrowly focusing on the events that occurred *after* the cash offer was made entirely ignores the *totality of circumstances*—the proper scope for a probable cause determination. Under the City's own argument—that walking toward the location where the sex act is to occur while talking in a sexual manner shows mutual assent—UC 31107 and Pinter had *already agreed* to have sex *before* UC 31107 introduced any notion of cash-for-sex.[181] The existence of an agreement for sex gratis *immediately preceding* the offer of money fundamentally alters the facts available to UC 31107. UC 31107 knew he agreed to a free exchange of oral sex when he first broached the idea of a monetary transaction. This last point bears emphasis; it was UC 31107, not Pinter, who injected—out of nowhere—the element of a "fee".

The word "fee" in Section 230.00 of the Penal Law has been construed by New York courts to mean payment in return for *professional* services.[182] The concept of a fee exchange restricts the statute's reach by requiring an aspect of commercialism.[183] As one court long ago explained: it is not prostitution where "a wife . . . withholds the performance of her conjugal duties unless her husband gives her a mink coat."[184] However offensive that example is to contemporary notions of gender and marital roles, the point remains the same—"prostitution involves the exchange of sex for a fee on a professional basis."[185]

**181.** In this connection, I observe that, in 1983, the New York Court of Appeals declared Section 240.35(3) of the Penal Law unconstitutional on due process grounds. See *People v. Uplinger*, 58 N.Y.2d 936, 460 N.Y.S.2d 514, 515, 447 N.E.2d 62 (1983). This provision criminalized "loiter[ing] or remain[ing] in a public place for the purpose of engaging, or soliciting another person to engage, in oral sexual conduct, anal sexual conduct or other sexual behavior of a deviate nature." N.Y. Penal L. § 240.35(3). Notwithstanding Uplinger, the New York Legislature did not repeal the void statute and law enforcement, including the NYPD, continued to vigorously enforce it. See *Casale v. Kelly*, 710 F.Supp.2d 347, 351 n. 6, 351–59, Nos. 08 Civ. 2173, 05 Civ. 5442, 2010 WL 1685582, at *1 n. 6, *2–*6 (S.D.N.Y. Apr. 26, 2010). In April 2010, this Court held the City of New York in contempt for failing to cease enforcing the void law, despite an abundance of time and opportunity to do so. See *id.* at 359–64, at *7–*9. Finally, in July 2010—twenty-seven years after Section 240.35(3) was struck down—the Legislature passed and Governor Patterson signed legislation repealing the provision, among other subsections of the loitering law judicially invalidated decades ago. See 2010 N.Y. Sess. Laws Ch. 232 (A.5537–A).

**182.** *See, e.g., People v. Medina*, 179 Misc.2d 617, 685 N.Y.S.2d 599, 601 (Crim.Ct.N.Y.

City 1999) ("The purpose of Article 230 is to prohibit the commercial exploitation of sexual gratification or public solicitation of a sex act for a fee.") (citing *In re Dora P.*, 68 A.D.2d 719, 418 N.Y.S.2d 597 (1st Dep't 1979) and *People v. Costello*, 90 Misc.2d 431, 395 N.Y.S.2d 139 (Sup.Ct.N.Y.Cty.1977)); *Cherry v. Koch*, 129 Misc.2d 346, 491 N.Y.S.2d 934, 944 n. 7 (Sup.Ct. Kings Cty. 1985) (" 'The Fair Import of the Word [sic] 'Fee' then is payment in return for professional services rendered. . . . 'Fee' in Section 230.00 of the Penal Law can fairly be said to connote professionalism. It restricts the purview of the statute.' ") (quoting *People v. Block*, 71 Misc.2d 714, 337 N.Y.S.2d 153, 157 (Cty. Ct. Nassau Cty.1972)); *id.* at 945–46 (observing prostitution's "commercial aspect of sex for a fee").

**183.** *See Medina*, 685 N.Y.S.2d at 601; *Cherry*, 491 N.Y.S.2d at 944–46; *Block*, 337 N.Y.S.2d at 157.

**184.** *Block*, 337 N.Y.S.2d at 157. *Accord Cherry*, 491 N.Y.S.2d at 945–46.

**185.** *People v. Halmond*, 190 Misc.2d 175, 737 N.Y.S.2d 787, 791 (Sup.Ct. Monroe Cty.2001) ("[E]ngag[ing] in sexual relations for alcohol and drugs . . . [does] not constitute prostitution.").

Given the prior agreement for sex gratis and the actions taken toward performing that agreement, Pinter's silence and subsequent actions cannot reasonably be viewed *as an acceptance of the offer of a fee on a professional basis.*[186] Pinter was, moreover, justifiably confused by the offer of money, rendering his silence unsurprising. Why, for example, would UC 31107 pay for something that Pinter had already agreed to do for free? And why would a young attractive man seek to pay to fellate Pinter?[187] A reasonable officer in UC 31107's shoes would have expected, at a minimum, that Pinter would ask himself such questions.

Of course, Pinter and UC 31107 continued to walk to the location where the sex act was to take place (though they did not actually arrive at that location) and they discussed their penis sizes and flirted about their ages. But these facts—again, when viewed in the context of the prior agreement and the entire encounter—do not make it *probable* that Pinter agreed to accept a fee for professional services. What is more, at the time when UC 31107 raised the issue of money, Pinter and UC 31107 were already walking toward's the latter's car and were *already* speaking in a sexual manner. These circumstances further undermine any belief that Pinter had assented to exchange sex for a fee. It is also important to recognize that it was UC 31107—not Pinter—who posed the questions about penis size and age.[188] And UC 31107's awareness of Pinter's age—52 at the time of his arrest—should also have given UC 31107 pause as to whether Pinter was a prostitute.[189] At most, Pinter's behavior after UC 31107 offered the money raised a *suspicion* of criminal activity. A suspicion, even if reasonable, is not probable cause.[190]

■ An officer of "reasonable caution" in these circumstances would have asked a follow-up question when faced with Pinter's silence about whether he meant to accept the money.[191] A host of simple inquiries could have sufficed. For example: "So, how about the money?" or "I'd like to pay you; is that cool?" or even "Hey, I hope this is okay with you." I recognize that UC 31107 was not required to "make a full investigation into [Pinter's] state of

---

186. Even if Pinter had agreed to accept the cash, this would appear to fall under the category of a tip or gratuity rather than a commercial transaction—given that the two already agreed to a sexual encounter.

187. These questions are not merely hypothetical—Pinter actually asked himself these things in the short period of time before his arrest. *See Pinter Dep. at* 108–109; Compl. ¶ 41.

188. See Pinter Dep. at 111 ("A: After his statement about where his car was, he asked me how big I was. Q: How big meaning the size of your penis? A: I assumed so, yes. Q: Did you answer him? A: Yes, I did.").

189. See *id.* at 112 ("A: He asked me how old I was? Q: What did you say to him? A: I asked him to guess. Q: What did he guess? A: He said 35. Q: What did you say? A: I said, thanks, why don't you switch those two numbers around, and you'll be much closer to my age. Q: What did he say? A: And with surprise he said '53?', and I said, 'almost, I'm 52.' ").

190. *See Mallory,* 354 U.S. at 455, 77 S.Ct. 1356; *Walczyk,* 496 F.3d at 157.

191. *Cf. Bradley v. Jusino,* No. 04 Civ. 8411, 2009 WL 1181617, at *8 (S.D.N.Y. May 4, 2009) ("Many courts, including those in this Circuit, have recognized that in certain circumstances, an arresting officer is obligated to make a minimal inquiry before making an arrest.... [W]hile an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause,' *Panetta v. Crowley,* 460 F.3d 388, 396 (2d Cir.2006), it does not follow that a court cannot consider an officer's failure to make an inquiry in determining whether the officer's belief that probable cause existed was objectively reasonable.").

mind prior to taking action."[192] "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."[193] But here, as already discussed, probable cause did not yet exist for Pinter's arrest given the prior agreement for sex gratis. Nor were there any exigent circumstances—Pinter was not about to flee, for example—that excuse UC 31107 from failing to make a reasonably thorough investigation prior to ordering Pinter's arrest.[194]

Defendants place heavy reliance on a single 1998 criminal court case, *People v. A.S.*, which dismissed a form criminal complaint alleging prostitution in conclusory terms.[195] In that case, the defendant was arrested and charged with violating Section 230.00 of the Penal Law. The entire criminal complaint stated: "Deponent states that while deponent was acting as an undercover officer the defendant agreed to engage in sexual conduct with the deponent ... in exchange for $60." [196]

The court's brief opinion then discusses the required element that the defendant "agreed" to do the illicit act. The court noted that the prosecution must provide evidence "that defendant actually agreed to engage in a sexual act for a fee under circumstances evidencing the requisite criminal intent." [197] The court also stated, "[m]ore fundamentally, the complaint must allege facts that make a prima facie showing defendant actually agreed to engage in a sexual act for a fee."[198] While it is true that the court provided examples of agreement—accepting a fee or "accompanying the undercover officer to a place where the sexual act might occur"[199]—these examples are provided in a complete vacuum. In fact, no circumstances are recounted that would permit that court or any court to judge whether the requisite intent to agree could be demonstrated. As a result, the case carries little, if any, precedential weight with respect to the issues presently before this Court.[200]

**192.** *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir.1997). Accord *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir.1989) ("It bears repeating that probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful. It is therefore of no consequence that a more thorough or more probing investigation might have cast doubt upon the situation." (quotation marks omitted)).

**193.** *Ricciuti*, 124 F.3d at 128. *But see Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir.2003) ("[W]e do not read Ricciuti to permit an officer to deliberately disregard facts known to him which establish justification.").

**194.** *See Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir.1999) ("[L]aw enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the agents wait to obtain more facts before seeking to arrest." (quotation marks and alterations omitted)); *Bradley*, 2009 WL 1181617, at *8 ("Defendant was not in possession of any evidence, such as a statement from a third-party witness, on which to reasonably base his probable cause determination, and the duty to inquire is not being invoked in order to require officers to conduct 'mini-investigations' before determining whether probable cause exists.").

**195.** *See* 685 N.Y.S.2d 573.

**196.** *Id.* at 574.

**197.** *Id.* at 575 (emphasis added).

**198.** *Id.*

**199.** *Id.*

**200.** Furthermore, a number of courts—including the Appellate Term, Second and Eleventh Judicial Districts, of the First Department in an unpublished disposition—have rejected the holding of *A.S.* that the term "agree" is conclusory. *See, e.g., People v. Hilo*, Nos. 2003–931 Q CR, 2003–933 Q CR, 2003 934 Q CR, 4 Misc.3d 132(A), 2004 WL 1517151 (1st Dep't July 1, 2004), *Rodas,*

Here, by contrast, the circumstances alleged by Pinter made it unreasonable for the officer to conclude that Pinter had either agreed to engage in a sexual act for a fee (as opposed to a mere gratuity) given the previous agreement to consensual sex gratis and the steps taken in furtherance of that agreement, or that Pinter was providing a professional service for a fee. Viewing the entire encounter between UC 31107 and Pinter as a whole, UC 31107 could not have had an objectively reasonable belief that, after he picked Pinter up and agreed to a "consensual" sexual encounter,[201] the men's gratuitous agreement morphed into a commercial act of prostitution.

Obviously, the preceding analysis is based on Pinter's version of the facts. UC 31107's version of the circumstances leading to Pinter's arrest is drastically different.[202] This is a classic case of dueling accounts of an event where the trier of fact, in light of all of the evidence and after assessing credibility, will be required to decide whose version or which combination of versions is accurate. This is not the task at hand, however. Pinter has alleged that he was arrested without probable cause—a constitutional violation. Defendants have not identified a single case, state or federal, holding to the contrary in comparable circumstances. It is, moreover, defendants' burden at this juncture to establish their "entitlement to qualified immunity."[203]

### b. "Arguable" Probable Cause

■ The Second Circuit has held that "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause."[204] Under this line of cases, "[a] police officer is entitled to qualified immunity from a claim for arrest, even in the absence of probable cause, if: (1) it was objectively reasonable for the officer to believe that probable cause existed, or (2) if officers of reasonable competence could disagree on whether there was probable cause."[205]

As part of the tension in the case law about whether the "objectively reasonable" inquiry is framed as part of, or apart from, the "clearly established" inquiry,[206] there is an important question about whether "arguable probable cause" is appropriately considered outside of the clearly established inquiry. As put by Justice Sotomayor when she was a member of the Second Circuit:

It is not surprising, then, that "arguable probable cause" finds no mention in any Supreme Court opinion; the need for a separate term to describe this concept arises only once we have improperly splintered the "clearly established" inquiry. Because I believe "arguable probable cause" is both imprecise and an outgrowth of the first flaw in our qualified immunity analysis, I do not agree with the majority's use of the term. I recognize that the distinction I am drawing is a fine one, but I believe it has real

2010 WL 1136506, at *2. More importantly, I am aware of no decision that has carefully analyzed the quid pro quo aspect of the fee for professional services raised by the case now before this Court.

**201.** *See* Compl. ¶¶ 32, 36, 37.

**202.** *See supra* n. 56.

**203.** *Palmer v. Richards*, 364 F.3d 60, 67 (2d Cir.2004).

**204.** *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir.2000).

**205.** *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991). Accord *Zellner*, 494 F.3d at 369; *Lennon v. Miller*, 66 F.3d 416, 420–21 (2d Cir.1995).

**206.** *See supra* Part III.B.2.

consequences.... By introducing reasonableness as a separate step, we give defendants a second bite at the immunity apple, thereby thwarting a careful balance that the Supreme Court has struck between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties.[207]

Because of the inconsistent precedent binding on this Court and my belief that "reasonableness—and therefore the existence of 'arguable probable cause'—are considerations that properly fall *within the clearly established inquiry as the* Supreme Court has described it[,]"[208] I do not reach the issue of whether UC 31107 had arguable probable cause separate from the question of whether the law he violated was clearly established. What is more, defendants do not even argue the issue of arguable probable cause apart from the clearly established inquiry.[209]

### 2. Pinter's Right Was Clearly Established

■ "For a constitutional right to be 'clearly established' for purposes of determining whether an officer is entitled to qualified immunity, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' "[210] "In deciding whether a right was clearly established, we ask: (1) Was the law defined with reasonable clarity? (2) Had the Supreme Court or the Second Circuit affirmed the rule? and (3) Would a reasonable defendant have understood from the existing law that the conduct was unlawful?"[211] "Because qualified immunity is an affirmative defense ... 'the defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time.' "[212]

As a general matter, "[t]here is no doubt that the right to be free from arrest without probable cause [is] clearly established."[213] As to the particulars of this case, defendants do not even argue that Pinter's right to be free from arrest for prostitution without probable cause to believe that he assented to exchange sex for a fee was not clearly established in October 2008 (the time of Pinter's arrest). Rather, defendants simply reargue the reasonableness of UC 31107's belief that Pinter agreed to an act of prostitution.[214]

However, for all of the reasons discussed above, UC 31107 did not have an objectively reasonable belief that Pinter's actions were unlawful.[215] In light of the (1) agreement between UC 31107 and Pinter for free sex and the steps both men took to

207. *Walczyk*, 496 F.3d at 168 (Sotomayor, J., concurring) (quotation marks and footnote omitted).

208. *Id.*

209. *See* Def. Mem. at 15–16.

210. *Mollica v. Volker*, 229 F.3d 366, 370 (2d Cir.2000) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

211. *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir.1998).

212. *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000) (quoting *Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir.1997)). *Accord* Palmer, 364 F.3d at 67.

213. *Jenkins*, 478 F.3d at 87.

214. *See* Def. Mem. at 16.

215. Again, as I have stressed, Pinter's version of the facts are accepted as true for the purposes of this motion. Because the objective reasonableness of "a defendant officer's conduct ... is a mixed question of law and fact," *Zellner*, 494 F.3d at 367, reasonableness cannot be finally determined at this time in light of the material factual disputes that exist between Pinter's and UC 31107's accounts.

consummate that agreement—all of which preceded any contemplation whatsoever of a monetary transfer—and (2) Pinter's silence as to the offer, it was objectively unreasonable for UC 31107 not to make a follow-up inquiry as to whether Pinter accepted the offer of a "fee" (a word that has been long construed by New York courts to limit the reach of the statute to professional, commercial transactions). Though Pinter and the undercover *continued* walking and talking flirtatiously, this conduct, at most, raised a *suspicion* about Pinter's assent to exchange sex for a fee. But Pinter's conduct following the offer—viewed in the totality of circumstances—does not establish a reasonable belief that it was *probable* that Pinter agreed to a commercial transaction.

In sum, no competent officer could reasonably believe that it was probable that Pinter committed prostitution where the undercover knew that he (the officer): initiated the contact, steered the conversation toward sex, agreed to consensual gratuitous sex, took steps toward the location where the sex act was to occur, raised the issue of cash-for-sex, faced silence as to whether Pinter meant to accept the cash, continued walking toward the specified location, initiated further conversation about sex, and knew that Pinter was 52 years old. And there was no impediment to prevent the undercover from quickly pursuing a simple inquiry to ascertain additional information about whether Pinter had accepted or declined a fee offer. Accordingly, Pinter has alleged a constitutional violation of a clearly established right.[216]

## C. Other Claims

■■■ Defendants' opening Memorandum of Law is internally inconsistent as to the claims on which they seek summary judgment.[217] Defendants' Reply attempts

---

**216.** Defendants' only argument as to the Vice Detectives (UC 31107's team members) is that they are entitled to qualified immunity under the "fellow-officer" rule—that is, the Vice Detectives "were entitled to rely upon facts supporting probable cause for Pinter's arrest that were known to UC 31107." Def. Mem. at 17. Because UC 31107 did not have probable cause to believe that Pinter committed prostitution, the Vice Detectives have not established their entitlement to qualified immunity at this stage.

Defendants also argue that because Pinter "cannot show that a constitutional violation occurred, the corresponding cause of action against the municipality [is] mooted." *Id.* at 23. Defendants likewise argue (only in their reply) that, absent a constitutional violation, "all potential derivative liability claims for supervisory liability" must be dismissed. Defendants' Reply in Support of Their Motion for Summary Judgment ("Def. Reply") at 10. Accord *id.* at 11. However, because Pinter has alleged a constitutional violation, these arguments fail.

Defendants' only other contention as to municipal liability is: "Although Pinter makes reference to the arrests of other gay men around the City, he fails to plead any specific fats [sic] that would permit the Court to infer that those arrests were the result of a municipal policy or practice or any misconduct on the part of the City itself." Def. Mem. at 23. This argument is frivolous. The factual allegations recounted in Part II above more than satisfy the "plausibility" standard for pleading articulated by the Supreme Court in *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

**217.** Compare Def. Mem. at 2 (mentioning only the false arrest and malicious prosecution claims); *with id.* at 7 (stating "[d]efendants seek summary judgment ... on plaintiff's false arrest, malicious prosecution, excessive force, First Amendment and municipal liability claims" and failing to mention the malicious abuse of criminal process and unreasonable detention claims); *and with id.* at 8 ("Defendants UC 31107, Sterling, Michilena, Dailey and Madison are entitled to summary judgment on the defense of qualified immunity on plaintiff's false arrest claim." (emphasis added)).

to clarify the confusion and states that they seek summary judgment on the malicious prosecution, malicious abuse of process, discrimination, and associational claims, in addition to the false arrest claim.[218] Thus, defendants have waived any absolute or qualified immunity defense as to Pinter's excessive force and unreasonable detention claims.

As to the malicious prosecution, malicious abuse of process, discrimination, and associational claims, defendants ' sole argument is that, because there was probable cause for Pinter's arrest, each of the claims fail.[219] Defendants have not meaningfully argued any other ground for dismissal of any of these four claims.[220] Nor has Pinter meaningfully addressed them apart from the issue of probable cause. In these circumstances, the Court cannot be expected to—and indeed should not—create arguments in favor of or against dismissal of these claims.

At the close of discovery, the parties will be permitted to move for summary judgment on any of Pinter's claims. In so doing, defendants may raise any ground in support of such motion with respect to the malicious prosecution, malicious abuse of process, discrimination, and associational claims. With respect to the excessive force and unreasonable detention claims, defendants may raise any ground except absolute and qualified immunity.

## V. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted in part and denied in part. Defendant Hyman is hereby dismissed without prejudice from this suit. The Clerk of Court is directed to close this motion (Docket Entry # 19). A Final Pre–Trial/Pre–Motion Conference is scheduled for November 23, 2010, at 4:30 p.m.

## VI. POSTSCRIPT—ENTRAPMENT

■ Because the specter of entrapment has been raised by the parties and the public controversy surrounding the arrest of Pinter and others,[221] a few words are warranted on this issue. In New York, to establish the defense of entrapment, a defendant must prove, by a preponderance of the evidence, that he was actively induced or encouraged to commit the charged crime by the police or someone acting in cooperation with the police, and that he was not predisposed to committing the crime.[222]

---

**218.** *See* Def. Reply at 9–10.

**219.** *See id.*

**220.** For example, defendants mention Pinter's sexual-orientation discrimination claim in only three sentences that appear in the discussion of absolute immunity for Hyman. *See* Def. Mem. at 21–22.

**221.** *See supra* Part II.C; *Crosby,* —— F.Supp.2d ——, 2010 WL 2541097; Hauser, *supra* n.43; Duncan Osborne, "Bloomberg's Home Targeted in False Arrests Protest," *Gay City News* (Feb. 14, 2009), Ex. I to Meyerson Decl.; Paul Schindler, "Stop the Arrests," *Gay City News* (Feb. 6, 2009), Ex. I to Meyerson Decl.

**222.** *See* N.Y. Penal L. § 40.05 ("In any prosecution for an offense, it is an affirmative defense that the defendant engaged in the proscribed conduct because he was induced or encouraged to do so by a public servant, or by a person acting in cooperation with a public servant, seeking to obtain evidence against him for purpose of criminal prosecution, and when the methods used to obtain such evidence were such as to create a substantial risk that the offense would be committed by a person not otherwise disposed to commit it. Inducement or encouragement to commit an offense means active inducement or encouragement. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment."). *See also People v. Butts,* 72 N.Y.2d 746, 750–51, 536 N.Y.S.2d 730, 533 N.E.2d 660 (1988) ("Penal Law § 40.05 requires a showing both that the proscribed conduct was 'induced or encouraged' by official activity and that the defendant had no predisposition to engage in such conduct.").

[E]ntrapment is not a defense which negates the commission of the crime charged or the existence of any element thereof. Rather, it acts as a species of "confession and avoidance." The defense was designed merely to prevent punishment for an offense which is the product of the creative activity of the state's own officials by focusing on the inducing conduct of the police and the defendant's predisposition.[223]

A defendant is permitted to argue entrapment and to deny the commission of the crime, even if those arguments are inconsistent.[224]

 To the extent that Pinter and UC 31107 agreed to sex before UC 31107 made any offer of money to Pinter, entrapment would have been a viable affirmative defense to the criminal charge of prostitu-

tion.[225] While merely affording a defendant an opportunity to commit an offense is insufficient to warrant a finding of entrapment,[226] UC 31107—according to Pinter— did more than simply open the door for Pinter to prostitute himself. If there was an agreement for sex gratis and steps were taken in furtherance of that agreement prior to the offer of money, a reasonable jury could conclude that UC 31107 actively induced or encouraged the crime.[227] And similar to DANY's conclusion that Pinter likely did not go to Blue Door with the intent to solicit money for sex,[228] a reasonable jury could conclude that Pinter had no predisposition to commit prostitution.

Buttressing this assessment, the NYPD Legal Bureau itself "recommends [to officers] that the suggestion of sex or money come from the defendant" to "eliminate the affirmative defense of entrapment."[229]

**223.** *Torres v. State*, 228 A.D.2d 579, 644 N.Y.S.2d 748, 750 (2d Dep't 1996) (quoting *People v. Laietta*, 30 N.Y.2d 68, 75, 330 N.Y.S.2d 351, 281 N.E.2d 157 (1972)). Accord *Labensky v. The County of Nassau*, 6 F.Supp.2d 161, 177 (E.D.N.Y.1998) ("An entrapment defense is available only to a defendant who has committed all of the elements of the proscribed offense. . . . It is an excuse for a crime, not a denial of one."). For this reason, some courts have held that a successful entrapment defense does not strip an otherwise lawful arrest of probable cause. *See, e.g., Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 866 (7th Cir.2004); *Fridley v. Horrighs*, 291 F.3d 867, 874–75 (6th Cir. 2002); Labensky, 6 F.Supp.2d at 177; *Torres v. Marquardt*, No. 93 Civ. 2993, 1997 WL 1068680, at *4 (E.D.N.Y. Apr. 3, 1997). Nonetheless, neither the Supreme Court, the New York Court of Appeals, nor the Second Circuit appear to have so held. The question of whether a successful showing of entrapment can negate probable cause would require a fact-specific inquiry not easily encapsulated in broad rulings of law. For example, where an officer knows that someone is not predisposed to commit a crime and, nonetheless, entraps him, it is an open question whether the officer could reasonably believe that probable cause existed for the arrest. I

stress, however, that I do not base my immunity ruling on this view.

**224.** *See Butts*, 72 N.Y.2d at 748–49, 536 N.Y.S.2d 730, 533 N.E.2d 660.

**225.** The Second Circuit has stated that "'[w]hile entrapment may be a proper defense in a criminal action, a police officer's participation in such activity does not constitute a constitutional violation.'" *DiBlasio v. City of New York*, 102 F.3d 654, 657 (2d Cir.1996) (quoting *Jones v. Bombeck*, 375 F.2d 737, 738 (3d Cir.1967) (*per curiam*)).

**226.** *See People v. Brown*, 82 N.Y.2d 869, 872, 609 N.Y.S.2d 164, 631 N.E.2d 106 (1993).

**227.** Entrapment is question of fact for the jury, provided a sufficient factual predicate exists to charge a jury on entrapment. *See People v. McGee*, 49 N.Y.2d 48, 424 N.Y.S.2d 157, 399 N.E.2d 1177 (1979).

**228.** *See* DANY Aff. ¶ 5.

**229.** Internal Affairs Bureau ("IAB"), Investigative Findings with Respect to Pinter's Arrest ("IAB Findings") at 5 (emphasis added), Ex. B to defendants' 8/4/10 letter to the Court. The IAB investigates claims of serious mis-

When the " 'idea of the crime' originat[es] with the police," grounds for entrapment exist.[230]

Here, assuming Pinter is correct, then it was UC 31107 who approached Pinter, it was UC 31107 who began their conversation and steered it toward sex, and it was UC 31107 who offered the money. As Pinter plainly put it: "I was in that store shopping for a DVD, I was minding my own business, your officer approached me, butted his nose into my business, and created this whole incident." [231] If true, these circumstances not only reek of entrapment; they are unsettling and inappropriate.

SO ORDERED.

conduct and corruption of members of the NYPD. *See, e.g., Floyd v. City of New York,* No. 08 Civ. 1034, —— F.Supp.2d ——, ——, 2010 WL 2594627, at *1 (S.D.N.Y. June 25, 2010); *Casale,* 710 F.Supp.2d at 361–62, 2010 WL 1685582, at *8.

**230.** IAB Findings at 4. No policy or standards within the NYPD exist with respect to entrapment, though the NYPD prefers to avoid grounds for the defense. *See id.* at 5.

**231.** Pinter Dep. at 126.